**CHRIST'S BRIDE MINISTRIES, INC.**

v.

**SOUTHEASTERN PENNSYLVANIA TRANSPORTATION AUTHORITY, et al.**

**Civil Action No. 96–3631.**

United States District Court,
E.D. Pennsylvania,
Civil Division.

Aug. 16, 1996.

Mathew D. Staver, Frederick H. Nelson, Nichole, Arfaras, Kerr, Orlando, FL, for Plaintiff.

William H. Roberts, Jordana Cooper, Blank, Rome, Comisky & McCauley, Philadelphia, PA, David Rudovsky, Kairys & Rudovsky, Philadelphia, PA, Seth Kreimer, Philadelphia, PA, Daniel H. Wheeler, Blank, Rome, Comisky & McCauley, Philadelphia, PA, for Southeastern Pennsylvania Transportation Authority.

William H. Roberts, Jordana Cooper, Blank, Rome, Comisky & McCauley, Philadelphia, PA, for Transportation Display's, Inc.

David E. Loder, Duane, Morris & Heckscher, Philadelphia, PA, for Planned Parenthood of Southeastern Pennsylvania.

Catherine Albisa, Center for Reproductive Law and Policy, New York, NY, for Lisa Cox and Vicki Saporta.

## MEMORANDUM

BARTLE, District Judge.

This is a case about posters, in the Philadelphia subway and commuter rail stations, which carried the message, "WOMEN WHO CHOOSE ABORTION SUFFER MORE AND DEADLIER BREAST CANCER."

## I

Plaintiff Christ's Bride Ministries, Inc. ("CBM") has sued the Southeastern Pennsylvania Transportation Authority ("SEPTA"), the owner and operator of the commuter subway, bus and rail systems in the Philadelphia metropolitan area, and its licensee Transportation Displays, Inc. ("TDI") for removing CBM's previously installed antiabortion posters. CBM claims, pursuant to 42 U.S.C. § 1983, that defendants violated its right of free speech under the First and Fourteenth Amendments to the Constitution, and its right to equal protection under the Fourteenth Amendment. CBM also has a contract claim. Among other relief, CBM

seeks a permanent injunction to compel the reinstallation of its signs. The court held a non-jury trial on the merits. It now renders its findings of fact and conclusions of law in accordance with Rule 52 of the Federal Rules of Civil Procedure.

CBM is a small non-profit religious, educational, and charitable organization incorporated in Virginia. It has been engaged in a campaign over the last year and one-half to acquaint women in particular and the public generally with what it believes to be the health risks attendant to an abortion. As part of this effort, it has sought to post its message in the subway and commuter rail stations in various cities, including Baltimore, Philadelphia, and Washington.

In December, 1995 Bradley Thomas, the president of CBM, contacted SEPTA about the placement of antiabortion advertisements in SEPTA's subway and rail stations. Thomas was directed to TDI, which has a contract with SEPTA to solicit, oversee, and manage the placement of advertisements in and on SEPTA's buses, subways, trains and facilities. Under that contract TDI was prohibited from displaying "any libelous, slanderous, or obscene" material. SEPTA retained the right to approve in advance all advertising and to remove any advertisement it found to be objectionable for any reason.

After numerous phone conversations and discussions, TDI and SEPTA ultimately approved the copy for CBM's posters. They read, as noted above, "Women who choose abortion suffer more and deadlier breast cancer." The signs were graphically designed with bold white lettering on a background of black and bright red, except that the word "deadlier" was written in red. The posters also contained the following in small print: "Information: 1–800–634–2224," as well as CBM's name as the sponsoring organization. The 800 number did not connect to CBM. Instead, it belonged to an organization known as the American Rights Coalition ("ARC") located in Chattanooga, Tennessee. ARC would send callers various pamphlets explaining what it believed to be the linkage between abortion and breast cancer.

The written contract between TDI and CBM, which was for one year, was dated January 22, 1996. The contract included the amount CBM agreed to pay for the poster display and the number of posters to be installed. It also provided that if SEPTA "should deem such advertising objectionable for any reason, TDI shall have the right to terminate the contract and discontinue the service without notice."

On January 15, 1996, a week before the contract was dated, TDI placed two CBM signs in prominent locations by overhead clocks in Philadelphia's Suburban Station. Additional signs were located in 25 of the subway and commuter rail stations in Philadelphia and the surrounding suburbs.

Shortly after their installation, SEPTA and TDI required CBM to identify itself more prominently on the advertisements. CBM complied. It supplied "snipes" or large decals which TDI affixed to the posters. They contained the following language:

Christ's Bride, Ministries, Inc. (CBM) is a charitable, religious, educational, non-profit 501(c)(3) organization incorporated in Virginia. CBM, P.O. Box 22 Merrifield, VA 22116 (703) 598–2226

In early February, 1996, several weeks after the advertisements were displayed, SEPTA received a copy of a letter written by Dr. Philip Lee, Assistant Secretary of Health in the United States Department of Health and Human Services. The addressee of the letter was Mr. Lawrence Reuter, General Manager of the Washington Metropolitan Area Transit Authority, where CBM's signs had also appeared. In his correspondence, Dr. Lee asserted, "This ad is unfortunately misleading, unduly alarming, and does not accurately reflect the weight of the scientific literature." He added, "We strongly object to the ad because it appears to be based on studies that are inconclusive, biased, and poorly designed." He urged the Washington Metro system to withdraw the advertisements. Relying primarily on Dr. Lee's letter, SEPTA's General Manager, Louis Gambaccini, exercised SEPTA's contractual right and directed TDI to remove the CBM posters. TDI did so on February 16, 1996. Prior to their removal, SEPTA never made any independent study or determination as to the

accuracy of CBM's message, that is, whether or not women who have an abortion will in fact "suffer more and deadlier breast cancer."

CBM had spent over $3,300 for the printing of the posters and had paid SEPTA slightly over $6,000 for the display of the posters for two months. Since the advertisements had run for only one month, SEPTA returned to CBM $3,043, which represented half of its payment.

## II

Because the parties have stipulated to consolidate the preliminary injunction hearing with a trial on the merits, the court proceeds under the standard for a permanent injunction. First, the plaintiff must demonstrate that the court's exercise of equity jurisdiction is proper. Second, the plaintiff must actually succeed on the merits of its claim. Third, the plaintiff must show that the balance of the equities tips in favor of injunctive relief. *Roe v. Operation Rescue*, 919 F.2d 857, 867 n. 8 (3d Cir.1990). We turn first to the merits of plaintiff's claim.

As a preliminary matter, it is undisputed that SEPTA and its agent TDI are state actors for purposes of this lawsuit, and therefore are subject to First and Fourteenth Amendment constraints. *See Lebron v. National Railroad Passenger Corporation*, — U.S. —, —, 115 S.Ct. 961, 972, 130 L.Ed.2d 902 (1995). SEPTA, created in 1968 by Act of the General Assembly, operates pursuant to 74 Pa.Cons.Stat.Ann. § 1501 et seq.; *see Feingold v. SEPTA*, 512 Pa. 567, 517 A.2d 1270, 1275 (1986). It "exercise[s] the public powers of the Commonwealth as an agency and instrumentality thereof." 74 Pa.Cons.Stat.Ann. § 1502. Moreover, it cannot be gainsaid that the issue of abortion is one of the most spirited subjects of current public discourse. CBM's antiabortion message is a form of political speech protected by the First Amendment.[1] Consequently, we must determine if a state actor may prohibit such speech and if so under what circumstances.

It is well settled that the government's ownership of property does not automatically open that property to all speech. Rather, as the Supreme Court has stated:

> Even protected speech is not equally permissible in all places and at all times. Nothing in the Constitution requires the Government freely to grant access to all who wish to exercise their right to free speech on every type of Government property without regard to the nature of the property or to the disruption that might be caused by the speaker's activities.

*Cornelius v. NAACP Legal Defense and Educational Fund*, 473 U.S. 788, 799–800, 105 S.Ct. 3439, 3447, 87 L.Ed.2d 567 (1985).

To determine what limits the government may place on protected speech, the Supreme Court requires us to engage in an exercise known as forum analysis. *See Perry Education Association v. Perry Local Educators' Association*, 460 U.S. 37, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983); *International Society for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 112 S.Ct. 2701, 120 L.Ed.2d 541 (1992). According to *Perry*, "[t]he existence of a right of access to public property and the standard by which limitations upon such a right must be evaluated differ depending upon the character of the property at issue." *Perry*, 460 U.S. at 44, 103 S.Ct. at 954. The relevant forum in this case is SEPTA's subway and rail stations.

The Court in *Perry* recognized three types of fora: (1) the traditional public forum; (2) the public forum created by government designation; and (3) the nonpublic forum. Traditional public fora are those places "which by long tradition or by government fiat have been devoted to assembly and debate...." *Id.* at 45, 103 S.Ct. at 954. This category includes parks, public sidewalks, and meeting halls. The government is subject to strict scrutiny in any attempt to limit First Amendment activity in a traditional public forum. It may exclude speech from a public forum "only when the exclusion is

---

**1.** Defendants argue strenuously that the plaintiff's message is commercial speech entitled to significantly lesser protection than political speech. We reject this argument as without merit.

necessary to serve a compelling state interest and the exclusion is narrowly drawn to achieve that interest." *Cornelius,* 473 U.S. at 800, 105 S.Ct. at 3448.

The second category, a designated public forum, consists of "public property which the state has opened for use by the public as a place for expressive activity." *Perry,* 460 U.S. at 45, 103 S.Ct. at 955. The government does not create a public forum by inaction or by permitting limited discourse, but only by intentionally opening a nontraditional forum for public discourse. *Cornelius,* 473 U.S. at 802, 105 S.Ct. at 3448–49. Although the government is not required to open or indefinitely retain the open nature of these places, the government is bound, once it does so, by the same limitations as exist in the traditional public forum context. If SEPTA has designated the subway and rail systems as public fora, then the antiabortion sign may not be excluded without the showing of a "compelling government interest." *Id.* at 800, 105 S.Ct. at 3447–48.

In contrast, a nonpublic forum, the third category, "is not by tradition or designation a forum for public communication...." *Perry,* 460 U.S. at 46, 103 S.Ct. at 955. The mere fact that government property is used for expressive activity does not qualify it as a public forum. Rather, "the State, no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated." *Id.* If the subway and rail stations are nonpublic fora, the standard for review of any limitation on speech is not one of strict scrutiny. Rather, SEPTA may restrain speech "based on subject matter and speaker identity so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral." *Cornelius,* 473 U.S. at 806, 105 S.Ct. at 3451.

In *Lehman v. City of Shaker Heights,* 418 U.S. 298, 94 S.Ct. 2714, 41 L.Ed.2d 770 (1974), a candidate for state office sought to advertise his candidacy on buses in the city transit system. While the city refused to permit political advertisements of any kind, it allowed commercial advertising as well as messages for public service groups. The Su-

preme Court held that advertising space on a city transit system was not a public forum for purposes of the First Amendment. Refusal to accept political advertising was not a violation of the Constitution.

In its forum analysis, the Court was influenced by the fact that the commuters used the transit system by necessity and were a captive audience. The plurality opinion added:

> Here, we have no open spaces, no meeting hall, park, street corner, or other public thoroughfare. Instead, the city is engaged in commerce.... The car card space, although incidental to the provision of public transportation, is part of the commercial venture. In much the same way that a newspaper or periodical, or even a radio or television station, need not accept every proffer of advertising from the general public, *a city transit system has discretion to develop and make reasonable choices concerning the type of advertising that may be displayed in its vehicles.*

[emphasis added]. *Lehman,* 418 U.S. at 303, 94 S.Ct. at 2717.

More recently, in *International Society for Krishna Consciousness, Inc. v. Lee,* 505 U.S. 672, 112 S.Ct. 2701, 120 L.Ed.2d 541 (1992), the Supreme Court determined that the interior of an airport terminal operated by a public authority is a nonpublic forum for purposes of solicitation by a religious group. The Court cited with approval its decision in *Lehman.* It went on to explain:

> Where the government is acting as a proprietor, managing its internal operations, rather than acting as lawmaker with the power to regulate or license, its action will not be subjected to the heightened review to which its actions as a lawmaker may be subject.

*Krishna,* 505 U.S. at 678, 112 S.Ct. at 2705.

The Court emphasized that a public forum is not created simply because it is a place where the public may freely come and go. In coming to its conclusion that the airport terminal was a nonpublic forum, the Court declared that transportation centers do not have and have not traditionally had as their purpose the "free exchange of ideas." *Krish-*

*na,* 505 U.S. at 682, 112 S.Ct. at 2707. It further noted that "sites such as bus and rail terminals traditionally have had *private* ownership," a factor negating any notion that they were designed to be treated as market places for debate on public issues. *Id.* at 681, 112 S.Ct. at 2706–07.

We think it is clear that stations in a public transit system do not constitute a traditional public forum. They are not parks, sidewalks, streets, or meeting halls. CBM, however, argues that by virtue of the extensive advertising it accepts, SEPTA has designated its subway and rail system as a public forum. Plaintiff contends that SEPTA exercises little control over who may advertise and the content of their messages. We reject this contention.

SEPTA presented ample evidence that it retains firm control over the types of advertising which may be displayed in its stations. It has rules and standards. Since garden variety commercial advertisements constitute 99 percent of its book of business, SEPTA rarely interferes with an advertiser's chosen message. Yet, its role in approving messages is not merely perfunctory. Thus, while an attorney generally may advertise her legal services, SEPTA, not surprisingly, has consistently prohibited any mention of representation for railroad, subway or bus injuries. SEPTA has also exercised its privilege to reject advertisements it considers offensive or in bad taste. For example, SEPTA recently disapproved a hosiery commercial with a scantily clad model proposed for a "wrap-around" display on a city bus.[2] SEPTA officials prohibited it as too risque for such a conspicuous space. SEPTA has clearly exercised its right to regulate advertising and to exclude messages which are contrary to its standards. It has not created a public forum in its subway and train stations.

SEPTA, we conclude, is acting here as a proprietor and not as a lawmaker or regulator. It owns and is operating what is essentially a commercial venture, a public transportation system. SEPTA stations, where CBM's advertisements appeared, are designed to facilitate the rapid and inexpensive movement of commuters from one place to another. Commuters are there to travel, not to debate. The purpose of the SEPTA stations is not to promote the free exchange of ideas, and SEPTA has never indicated to the contrary.[3] *See Krishna,* 505 U.S. at 680–82, 112 S.Ct. at 2706–08. Like travelers in any station or terminal, they are a captive audience for any advertisement displayed. *See Lehman,* 418 U.S. at 302, 307, 94 S.Ct. at 2716–17, 2719. In sum, under the Supreme Court's analysis in *Lehman* and *Krishna,* SEPTA's subway and rail stations and their advertising space fit neatly within the category of a nonpublic forum.

### III

Since the SEPTA system is a nonpublic forum, the government may restrict access "based on subject matter and speaker identity so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral." *Cornelius,* 473 U.S. at 806, 105 S.Ct. at 3451. SEPTA's decision to restrict access to a nonpublic forum "need only be reasonable; it need not be the most reasonable or the only reasonable limitation." *Id.* at 808, 105 S.Ct. at 3452.

SEPTA and TDI argue that their actions meet this standard. They contend that re-

---

**2.** Such "wrap-around" advertisements envelop the entire circumference of the bus with a plastic-type cover providing a prominent method for reaching large numbers of potential customers.

**3.** To the extent it is relevant, the court takes judicial notice of some history. The Pennsylvania Railroad and the Philadelphia and Reading Railroad each built, in the nineteenth century, a system of commuter rail lines which are now part of SEPTA. They or their private successors owned and operated these two systems into the 1960's. While the Broad Street subway was constructed and owned by the City of Philadel-

phia, it was leased until some 30 years ago to a private company, first the Philadelphia Rapid Transit Company ("PRT"), and then the Philadelphia Transportation Company ("PTC"). The Market–Frankford elevated line has a more complicated history. The section between Frankford Avenue and Arch Street was built and owned by the City but leased successively to the PRT and PTC until the advent of SEPTA. The remainder of the line to 69th Street was constructed and owned privately. *See Krishna, supra* at 681, 112 S.Ct. at 2706–07.

moval of the plaintiff's antiabortion signs was a reasonable decision because they relied on the representation of a high government official in the United States Department of Health and Human Services. The letter of Dr. Philip Lee, Assistant Secretary of Health, warned that CBM's message that "women who choose abortion suffer more and deadlier breast cancer" is "unfortunately misleading, unduly alarming, and does not accurately reflect the weight of the scientific literature." SEPTA asserts that having received Dr. Lee's pronouncement it exercised sound judgment in removing an alarmist message trumpeting to the public inaccurate and misleading health information.

At trial, we heard extensive testimony from four experts concerning any links between abortion and breast cancer. Dr. Clark Heath, Dr. Lynn Rosenberg, and Dr. Polly Newcomb testified for SEPTA and TDI. Dr. Joel Brind testified for CBM.

Dr. Heath is a medical doctor and since 1988 has held the position of Vice President for Epidemiology[4] and Surveillance Research at the National Cancer Institute in Atlanta, Georgia. Dr. Heath is thoroughly familiar with the research concerning induced abortion as a possible risk factor for breast cancer. Dr. Rosenberg holds a doctorate in epidemiology and is currently a professor of epidemiology at the Boston University School of Medicine. Dr. Newcomb, a professor at the University of Wisconsin Medical School, holds a Ph.D. in epidemiology and a master's degree in public health. She is presently on staff at the Fred Hutchinson Cancer Research Center in Seattle, Washington. Dr. Rosenberg and Dr. Newcomb have each co-authored studies about the causes of breast cancer.[5]

Drs. Heath, Rosenberg, and Newcomb all expressed the unequivocal opinion that existing epidemiological research does not support a cause and effect relationship between abortion and breast cancer. They specifically repudiated the statement that "women who choose abortion suffer more and deadlier breast cancer."

The experts discussed several factors underlying their conclusions. First, they cited the lack of consistency between the results of numerous studies on the subject.[6] While acknowledging that some studies support a weak association between induced abortion and breast cancer, they pointed out that others do not indicate any correlation at all. Second, most of the studies to date were "retrospective" in their design, as opposed to "prospective." That is, they focused on a woman's past medical history rather than follow women and their medical history into the future. Retrospective studies are more likely to produce biased results because of the potential that subjects in the study will inaccurately recall or report information. They also explained the effect of "confounding variables," that is, the possibility that other risk factors for breast cancer such as age or family history may influence the results of a study attempting to test the link between abortion and breast cancer.

Dr. Heath noted that among studies which are most comprehensive, including the studies of Dr. Rosenberg and Dr. Newcomb, the findings have not been particularly consistent. He concluded in his report:

> Given this variability in study findings, coupled with the low levels of risk described and the many methodologic difficulties involved in all such research, it seems clear at present that no consistent association has been established and hence

---

4. Epidemiology is the science that deals with the incidence, distribution, and control of disease in a population.

5. For example, Drs. Rosenberg and Newcomb have studied the relationship of breast cancer to such independent risk factors as alcohol and coffee consumption, cigarette smoke, oral contraceptives, breast implants, physical activity, multiple births, and abortion. In 1988, Dr. Rosenberg conducted a study published in the American Journal of Epidemiology entitled "Breast cancer

in relation to the occurrence and timing of induced and spontaneous abortion." Dr. Newcomb is the author of one of the most recent and comprehensive studies on the subject of pregnancy termination and breast cancer, published in the Journal of the American Medical Association in 1996.

6. Approximately 23 studies have been conducted which include specific data on induced abortion and breast cancer incidence.

that no cause-effect relationships can be inferred. It also seems safe to suppose that, if increased risks do in fact exist, they are likely to be very small.

These experts also discussed the concept of relative risk value, that is, the percentage increase in the incidence of disease based on a particular risk factor.[7] For example, according to Dr. Newcomb, the relative risk of smoking as a factor in the incidence of lung cancer is approximately 22.0. Therefore, a person who smokes regularly is 22 times more likely to experience lung cancer than a person who does not smoke. In the scientific community, due to the size of the relative risk factor, it is widely accepted that smoking causes lung cancer.

In the epidemiology of breast cancer, there are two factors with positive risk associations clearly acknowledged to have a causal relationship: age and family history. In contrast to smoking and lung cancer, Dr. Newcomb's study produced a relative risk factor of only 1.23 between induced abortion and breast cancer. This means that for women without a history of induced abortion, one in one hundred would suffer from breast cancer. For women with a history of an induced abortion, 1.23 women out of one hundred would contract breast cancer. All three experts testified that a relative risk value in the range of 1.23 is an extremely weak association. Dr. Newcomb stated in her expert report:

> Because our study results were equivocal, likely biased, and consistent with an extensive literature which has been unable to establish a clear link between abortion and breast cancer, ... I must repudiate any implication that our study supports this interpretation. In addition, our study did not evaluate breast cancer mortality, so we provide no information on survival in women with a history of induced abortion....

CBM presented as its expert Dr. Joel Brind, who testified that there is a causal link between induced abortion and the incidence of breast cancer. Dr. Brind has a Ph.D. in biochemistry and is a professor of biology and chemistry at Baruch College. He has written extensively in the lay press, such as the National Right to Life News, on the subject of abortion and breast cancer. While Dr. Brind has published scientific studies in peer review journals in other areas, he has never conducted research on the epidemiology of breast cancer. He is not an epidemiologist. He has, however, authored a study entitled "Induced Abortion as an Independent Risk Factor for Breast Cancer: a Comprehensive Review and Meta-analysis," which is scheduled to be published by a British peer review journal later this year. This "meta-analysis" is a review of 23 published epidemiological studies which address a correlation between induced abortion and breast cancer.

In his meta-analysis, Dr. Brind argued that of 23 independent studies, 12 studies, including Dr. Newcomb's, reported a statistically significant increase of breast cancer risk among women with a history of induced abortion.[8] Taking all the studies in his meta-analysis together, he found an average relative risk factor of 1.3. This increased risk, according to Dr. Brind, could not be attributed to bias such as underreporting of abortion history by the women in the studies. He further maintained that his meta-analysis accounted for "confounding" factors and showed a specific independent risk factor for induced abortion. He concluded that the preponderance of the published evidence on this topic supports a causal relationship between induced abortion and breast cancer.

Dr. Brind testified that a relative risk value of 1.3 for increased risk of breast cancer is sufficiently significant so that the public should be alerted. He noted that although the relative risk of oral contraceptives for increased incidence of breast cancer is only 1.1, manufacturers of birth control pills provide this information to consumers on the warning label. CBM's message is not misleading, he urged, when the relative risk

---

7. Epidemiologists use a scale centered at 1.0 to measure relative risk associations. A relative risk value over 1.0 is a positive association; a relative risk value below 1.0 is a negative association.

8. Six other studies showed positive associations, but not within the 95 percent certainty required to show statistical significance.

factor is at least as great as that for oral contraceptives.

Dr. Brind also cited three studies for the position that abortion causes "deadlier breast cancer." According to Dr. Brind, a 1983 study [9] by H.E. Ownby and others found that women who had had at least one abortion had a higher recurrence rate of breast cancer within three years than patients who had no abortion history. He relied on the Ownby study for the proposition that those patients with an abortion history had more malignant cancer than those who had never had an abortion.

Drs. Heath, Rosenberg, and Newcomb vigorously disputed the findings in Dr. Brind's meta-analysis as well as his use of this methodology here. They questioned its accuracy here where nearly all of the studies are retrospective as opposed to prospective. Primarily, however, Drs. Heath, Rosenberg, and Newcomb disagreed with the conclusions Dr. Brind drew from the study data. While acknowledging that many studies show a weak positive association between abortion and breast cancer, they maintained that the association is not meaningful evidence of a cause and effect link. Finally, they rejected Dr. Brind's interpretation that any of the three studies upon which he relied supported the notion that abortion causes "deadlier" breast cancer.

It is undisputed that SEPTA relied solely on Dr. Lee's letter in making its decision to remove CBM's posters. Admittedly, SEPTA did not do research of its own on any link between abortion and breast cancer. CBM contends that SEPTA's reliance on Dr. Lee's letter alone was an insufficient basis to withdraw CBM's posters. We disagree. The legal standard is whether SEPTA acted reasonably. It does not have to be the most reasonable or the only reasonable decision. *Cornelius,* 473 U.S. at 808, 105 S.Ct. at 3452. We find that it was reasonable for SEPTA, a transportation authority with no medical expertise, to rely solely on the medical opinion of a physician who is a high government health official. It had no duty to investigate further before taking action. In any event, the testimony of Drs. Heath, Newcomb, and

Rosenberg, all leading experts in the field of epidemiology, confirms that SEPTA's decision to eliminate the antiabortion signs was justified.

In reaching this conclusion, this court, of course, takes no position regarding the underlying scientific and medical question involved. Specifically, we do not decide whether Drs. Lee, Heath, Rosenberg, and Newcomb, on the one hand, or Dr. Brind, on the other, is right. The connection between abortion and breast cancer may be an issue which scientists and physicians will debate for years to come. Ultimately, a consensus may develop. At this time, we do not know. We decide only that based on the current state of scientific and medical knowledge, SEPTA did not act unreasonably in excluding CBM's "health" message as inaccurate and misleading. In sum, it was reasonable for SEPTA to respond in a way that was consistent with the views of Dr. Lee, Dr. Heath, Dr. Rosenberg, and Dr. Newcomb.

## IV

In order to pass constitutional muster, SEPTA's decision must not only be reasonable. It must also be "viewpoint neutral." *Cornelius,* 473 U.S. at 806, 105 S.Ct. at 3451. Defendants submit that they have not discriminated against CBM's message based on its antiabortion viewpoint. We agree. SEPTA has permitted advertising in subway and rail stations on both sides of the abortion debate. SEPTA has allowed messages advocating a woman's right to choose abortion and advertisements for medical clinics providing pregnancy termination services. On the other hand, SEPTA has run numerous contrary advertisements. For example, there have been signs urging teenagers to practice abstinence, offering counseling services to pregnant women, and encouraging pregnant woman to consider adoption as an alternative to terminating a pregnancy. One advertisement, which espoused the antiabortion cause, stated:

> For answers to your questions about: ... Abortion—Making a Decision, Call State Health Line ... for free booklet on fetal

---

**9.** This was a study of 238 breast cancer patients who had been pregnant.

development. *Fetus is Latin for little one—A little human is a baby....* [emphasis added]. CBM has presented no evidence that SEPTA has discriminated against it based on the content of its message. On the issue of abortion SEPTA has been "viewpoint neutral." *Cornelius,* 473 U.S. at 806, 105 S.Ct. at 3451.

## V

■ We can easily dispose of CBM's remaining arguments. CBM contends that SEPTA admitted in a memorandum dated February 14, 1996 from Mr. Gambaccini to SEPTA board members that CBM's message was protected by the First Amendment. The memorandum included the statement: "Our legal department, after reviewing the ad, concluded that the advertiser has a right to purchase the space and that the speech is protected under the First Amendment." Whatever the initial opinion of the SEPTA legal department on that particular date, clearly SEPTA has changed its mind. In any event, we are not bound by the one-time legal opinions of lawyers.

CBM has not met the threshold showing to obtain injunctive relief, namely, that it succeeds on the merits of its First and Fourteenth Amendment claims. CBM has also not seriously pursued the claims stated in its complaint under 42 U.S.C. §§ 1985 and 1986. They have no merit and we do not address them here.

Nor may CBM recover on its breach of contract claim. Section IV of the TDI–CBM contract clearly provides for the termination of the contract:

b. If for any cause beyond its control TDI shall cease to have the right to continue the advertising covered by this contract, or if [SEPTA] should deem such advertising objectionable for any reason, TDI shall have the right to terminate the contract and discontinue the service without notice.

The contract permits the termination that occurred in this case. TDI refunded to CBM any money paid for the time the signs were not posted. We will not permit CBM to recover for the money it spent to make the signs. CBM assumed this risk by entering a contract where TDI had the right to cancel

at the discretion of SEPTA based on the content of the advertisement.

## VI

In conclusion, we will enter judgment in favor of defendants Southeastern Pennsylvania Transportation Authority and Transportation Displays, Inc. and against plaintiff Christ's Bride Ministries, Inc.