OPINION OF THE COURT
Edward J. Greenfield, J.
This case poses for judicial resolution the question of whether the use for commercial purposes of a “lookalike” of a well-known personality violates the right of privacy legislatively granted by enactment of sections 50 and 51 of the Civil Rights Law. Put another way, can one person enjoin the use of someone else’s face? The questions appear not to have been definitively answered before.
Plaintiff, Jacqueline Kennedy Onassis, former First Lady of the United States, widow of President John F. Kennedy, one of the world’s most «powerful men, and of Aristotle Onassis, one of the world’s wealthiest men, but a well-known personality in her own right, moves for a *604 preliminary injunction under the Civil Rights Law to restrain defendants, all of whom were associated with an advertising campaign to promote the products and the image of Christian Dior — New York, Inc., from using or distributing a certain advertisement, and for associated relief. She alleges simply in her complaint that defendants have knowingly caused the preparation and publication of an advertisement for Dior products which includes her likeness in the form of a photograph of lookalike Barbara Reynolds; that Reynolds’ picture causes her to be identified with the ad to which she has not given her consent; that this was a violation of her rights of privacy and that it caused her irreparable injury.
Defendant, Christian Dior — New York, Inc., is the corporate entity which controls advertising and publicity for the 35 United States licensees who sell varied lines of merchandise under the coveted Dior label. The use of a well-known designer name in marketing goods is to render the product distinctive and desirable, to impart to the product a certain cachet, and to create in the public a mindset or over-all impression so that the designer names are readily associated and become synonymous with a certain status and class of qualities.
So it was that J, Walter Thompson’s Lansdowne Division, in conjunction with noted photographer Richard Ave-don, hit upon the idea of a running series of ads featuring a trio known as the Diors (one female and two males), who were characterized by an article in Newsweek magazine as idle rich, suggestively decadent, and aggressively chic. Indeed, it was suggested that this ménage á trois, putatively inspired by the characters portrayed by Noel Coward, Alfred Lunt and Lynn Fontanne in Coward’s 1933 play “Design for Living”, would become the most notorious personae in advertising since Brooke Shields refused to let anything come between her and her Calvins (for the uninitiated, blue jeans advertised under designer Calvin Klein’s label). To emphasize the impression of the unconventional, the copy for one ad had read, “When the Diors got away from it all, they brought with them nothing except ‘The Decline of the West’ and one toothbrush.” Evidently, to stir comment, the relationship portrayed in the ad campaign *605 was meant to be ambiguous, “to specify nothing but suggest everything.” The 16 sequential ads would depict this steadfast trio in varying situations leading to the marriage of two (but not the exclusion of the third), birth of a baby, and their ascent to Heaven (subject to resurrection on demand).
Thus, the Diors, and by association their products, would be perceived as chic, sophisticated, elite, unconventional, quirky, audacious, elegant, and unorthodox: The advertisement for the wedding, which is the one challenged here, is headed “Christian Dior: .Sportswear for Women and Clothing for Men.” Portrayed' in the ad are the happy Dior trio attended by their ostensible intimates, all ecstatically beaming — Gene Shalit, the television personality, model Shari Belafonte, actress Ruth Gordon, and Barbara Reynolds, a secretary who bears a remarkable resemblance to plaintiff Jacqueline Onassis. The copy, in keeping with the desired attitude of good taste and unconventionality, reads: “The wedding of the Diors was everything a wedding should be: no tears, no rice, no in-laws, ho smarmy toasts, for once no Mendelssohn. Just a legendary private affair.” Of course, what stamps it as “legendary” is the presence of this eclectic group, a frothy mix, the most legendary of which would clearly be Jacqueline Kennedy Onassis, shown discreetly behind Gordon and Shalit, obviously delighted to be in attendance at this “event”.
That the person behind Gordon and Shalit bore a striking resemblance to the plaintiff was no mere happenstance. Defendants knew there was little or no likelihood that Mrs. Onassis would ever consent to be depicted in this kind of advertising campaign for Dior. She has asserted in her affidavit, and it is well known, that she has never permitted her name or picture to be used in connection with the promotion of commercial products. Her name has been used sparingly only in connection with certain public services, civic, art and educational projects which she has supported. Accordingly, Lansdowne and Avedon, once the content of the picture and the makeup of the wedding party had been determined, contacted defendant Ron Smith Celebrity Look-Alikes to provide someone who could pass for Jacqueline Kennedy Onassis. That agency, which special *606 izes in locating and providing persons who bear a close resemblance to well-known personalities on request (and for a fee), came up with defendant Barbara Reynolds, regularly an appointments secretary to a Congressman, who, with appropriate coiffure and appointments, looks remarkably like Mrs. Onassis, and has made this resemblance an adjunct to her career.
The ad was run in September and October of 1983 in several upscale publications including Esquire, Harper’s Bazaar, the New Yorker, and the New York Times Magazine. It received widespread circulation, and apparently was the subject of considerable comment, as was the entire series. Dior reportedly committed $2.5 million to the campaign, and boasted that as a result, sales went through the roof. In opposition to the application for an injunction, defendants urge, among other things, that it is unnecessary because the ad has already appeared, and it is not scheduled for republication. However, they declined to enter into any formal stipulation to that effect, and trade papers are abuzz with speculation about the resurrection and reincarnation of the campaign, with possible television showings to reach an even wider audience. Moreover, the case presents an important question under the privacy law, and it is appropriate that it be judicially resolved. (Matter of Baumann & Son Buses v Board of Educ., 46 NY2d 1061, 1063; Le Drugstore Etats Unis v New York State Bd. of Pharmacy, 33 NY2d 298, 301.)
Section 50 of the New York Civil Rights Law provides: “A person, firm or corporation that uses for advertising purposes, or for the purposes of trade, the name, portrait or picture of any living person without having first obtained the written consent of such person * * * is guilty of a misdemeanor.”
Having defined the offense, and declaring it to be criminal, section 51 of the Civil Rights Law goes on to provide civil remedies for violation as well, including injunction and damages. “Any person whose name, portrait or picture is used within this state for advertising purposes or for the purposes of trade without the written consent first obtained as above provided may maintain an equitable action in the supreme court of this state against the person, firm *607 or corporation so using his name, portrait or picture, to prevent and restrain the use thereof; and may also sue and recover damages for any injuries sustained by reason of such use and if the defendant shall have knowingly used such person’s name, portrait or picture in such manner as is forbidden or declared to be unlawful by section fifty of this article, the jury, in its discretion, may award exemplary damages”.
Once the violation is established, the plaintiff may have an absolute right to injunction, regardless of the relative damage to the parties. (Blumenthal v Picture Classics, 235 App Div 570, affd 261 NY 504; Loftus v Greenwich Lithographing Co., 192 App Div 251; Durgom v Columbia Broadcasting Systems, 29 Misc 2d 394, 395.)
Is there a violation? Defendants, urging a strict and literal compliance with the statute, say that there is not. Plaintiff, arguing for a broader interpretation, insists that there is. As a general proposition, sections 50 and 51 of the Civil Rights Law, which created a new statutory right, being in derogation of common law, receive a strict, if not necessarily a literal construction. (Shields v Gross, 58 NY2d 338, 345; Arrington v New York Times Co., 55 NY2d 433, 439.) However, “ ‘[sjince its purpose “is remedial * * * to grant recognition to the newly expounded right of an individual to be immune from commercial exploitation” (Flores v Mosler Safe Co., 7 NY2d 276, 280-281; see Lahiri v Daily Mirror, 162 Misc 776, 779), section 51 of the Civil Rights Law has been liberally construed over the ensuing years.’ ” (Stephano v News Group Pub., 98 AD2d 287, 295.)
Plaintiff’s name appears nowhere in the advertisement. Nevertheless, the picture of a well-known personality, used in an ad and instantly recognizable, will still serve as a badge of approval for that commercial product. It is designed to “catch the eye and focus it on the advertisement”. (Negri v Schering Corp., 333 F Supp 101,105.) That, is why the use of a person’s “portrait or picture” without consent is also proscribed. Just what is comprehended by the term “portrait or picture”?
In Negri v Schering Corp. (supra), plaintiff, the well-known movie actress of the 1920’s, Pola Negri, objected to the publication of an advertisement in 1969 showing a *608 scene from one of her early movies with words issuing from her mouth in the balloon caption suggesting the use of the antihistamine drug Polaramine. To defendant’s contention that the picture did not really show plaintiff as she was then, the Southern District Court, applying New York law, held (p 105) that as long as the ad portrayed a recognizable likeness, it was actionable, declaring, “If a picture so used is a clear and identifiable likeness of a living person, he or she is entitled to recover damages suffered by reason of such use”.
In Ali v Playgirl, Inc. (447 F Supp 723), the portrait or picture was not an actual photo, but a composite photo-drawing depicting a naked black man in a boxing ring, with the recognizable facial features of the former world’s heavyweight champion. The Southern District Court, again applying New York law, held that the phrase “portrait or picture” as used in section 51 of the Civil Rights Law is not restricted to actual photographs, but comprises any representations which are recognizable as likenesses of the complaining individual. In that case, the picture represented something short of actuality — somewhere between representational art and a cartoon.
In Loftus v Greenwich Lithographing Co. (192 App Div 251, supra), the objection again was not to an actual picture of the plaintiff, but to an advertising poster for a movie called “Shame” which showed a sketch of a female figure in a costume plaintiff had popularized in a Ziegfeld production. The court rejected defendant’s contention that the poster was not an actual depiction of plaintiff. Despite changes that were made as between plaintiff’s actual picture and defendant’s drawing, the court found it evident that the drawing took plaintiff’s appearance as its starting point, and declared that slight changes or deviations would not thwart the application of the wholesome provisions of the Civil Rights Law.
In Young v Greneker Studios (175 Misc 1027), this court extended the literal definition of portrait or picture to include a manikin or sculpture for which plaintiff was the model. The words “portrait or picture” were construed to be broad enough to cover any likeness or representation of the plaintiff, whether two or three dimensional. On the other *609 hand, conveying the likeness of a person, not graphically, but through sound, by means of the imitation of a distinctive voice, does not come within the prohibition of the statute (possibly an oversight, since the possibility of reproducing and disseminating the sound of a voice was not contemplated in 1903 when sections 50 and 51 of the Civil Eights Law were first enacted). (See Lahr v Adell Chem. Co., 300 F2d 256, 258.) This is not because the portrayal of plaintiff’s distinctive vocal delivery was by an imitator, but because a voice was not construed as the equivalent of a name or picture, and the picture used was that of a duck.
The Court of Appeals, 70 years ago, in Binns v Vitagraph Co. (210 NY 51), dealt with the question of whether the use of the picture of another person suggestive of the plaintiff is a prohibited use of a plaintiff’s portrait or picture. The plaintiff was a wireless operator on a sinking ship, whose radioed distress signal, “COD”, resulted in the rescue of hundreds of passengers, and made him a hero. Defendant, attempting to capitalize on the widespread public interest in the story, did a photoplay based on the event (what we would today call a “docudrama”). A professional actor was employed to portray the plaintiff, and was photographed playing the part. The court declared (p 57), “A picture within the meaning of the statute is not necessarily a photograph of the living person, but includes any representation of such person. The picture * * * was intended to be, and it was, a representation of the plaintiff.” The court expressly rejected (p 57) the contention of the defendant that all it used “was an actual picture of a person made up to look like and impersonate the plaintiff.” While we might take a different view today as to whether a depiction of a newsworthy event (see Murray v New York Mag. Co., 27 NY2d 406) or a dramatized re-enactment or even a satirical portrayal is a commercial statement or protected comment (University of Notre Dame v Twentieth Century-Fox Film Corp., 22 AD2d 452, affd 15 NY2d 940), the court was clear that the photographic portrayal by one person to simulate another without consent was forbidden by the statute.
Defendants urge as controlling Lombardo v Doyle, Dane & Bernbach (58 AD2d 620), in which there was a dismissal *610 of an invasion of privacy action (by a vote of three to two) against a television commercial which showed an actor conducting a band at a New Year’s Eve party playing “Auld Lang Syne” similar to the way plaintiff bandleader had done for decades, and with which he was associated in the public mind. However, there the majority of court was refusing to equate a person’s style or characteristics or musical arrangements with a “name, portrait or picture” where plaintiff’s name was not mentioned and the actor did not physically resemble the plaintiff. Similarly, in Shaw v Time-Life Records (38 NY2d 201), plaintiff bandleader was denied the right to make claim under sections 50 and 51 of the Civil Rights Law against defendant for simulating the “sound” and style of arrangements of his swing era band. And in Toscani v Hersey (271 App Div 445), where the plaintiff was portrayed in the book and play “A Bell for Adano”, but under a different and fictionalized name, the court held that a work inspired by the acts, events and experiences of a living person is not an unauthorized use of his “name, portrait or picture”.
The principle to be distilled from a study of the statute and of the cases construing it is that all persons, of whatever station in life, from the relatively unknown to the world famous,, are to be secured against rapacious commercial exploitation. While the statute may not, by its terms, cover voice or movement, characteristics or style, it is intended to protect the essence of the person, his or her identity or persona from being unwillingly or unknowingly misappropriated for the profit of another. Shakespeare may not have been aware of advertising techniques, media hard-sell, or personal indorsements for product promotion, but the words he put in Iago’s mouth were right on target:
“Good name in man or woman, dear my lord,
Is the immediate jewel of their souls;
Who steals my purse steals trash; tis something, nothing;
‘Twas mine, ‘tis his, and has been slave to thousands;
But he that filches from me my good name
Robs me of that which not enriches him, And makes me poor indeed.”
*611 In those days, as the touchstone of recognition, name was all, conveyed in writing or by word of mouth. Today, the visual have superseded the verbal arts, and news photography, television, and motion pictures can accord instant world-wide recognition to a face. For some people, even without their American Express cards, the face is total identification, more than a signature or a coat of arms. (Cf. Orsini v Eastern Wine Corp., 190 Misc 235, affd 273 App Div 947.) The unauthorized use of a person’s signature would not pass muster under the statute because it was claimed merely to be a facsimile. Is a picture or portrait intended to. look like someone not that person’s picture if it is similarly a facsimile or a simulation?
The dictionary defines a “picture” as: “1. An image or likeness of an object, person or scene produced on a flat surface, especially by painting, drawing, or photography. 2. a printed reproduction of any of these. 3. anything closely resembling or strikingly typifying something else; perfect likeness; image” (Webster’s New Twentieth Century Dictionary [unabridged, 2d ed]).
A “portrait” is defined as: “1. A painting, photograph or other likeness of a person, especially one showing the face. 2. A verbal picture or description, especially of a person. 3. Any close likeness of one thing to another.” (American Heritage Dictionary of the English Language [new college ed, 1976].)
The statute is in the disjunctive. There need not be, as defendants suggest, a coupling of name and picture. The essence of what is prohibited, as the statute, the cases, and the dictionary definitions make clear, is the exploitation of one’s identity as that is conveyed verbally or graphically. A photograph may be a depiction only of the person before the lens, but a “portrait or picture” gives wider scope, to encompass a representation which conveys the essence and likeness of an individual, not only actuality, but the close and purposeful resemblance to reality. That is how it was defined in Binns v Vitagraph Co. (supra) as any representation, including the picture of another, which was intended to be, and did, in fact, convey the idea that it was the plaintiff.
*612 We are dealing here with actuality and appearance, where illusion often heightens reality and all is not quite what it seems. Is the illusionist to be free to step aside, having reaped the benefits of his creation, and be permitted to disclaim the very impression he sought to create? If we were to permit it, we would be sanctioning an obvious loophole to evade the statute. If a person is unwilling to give his or her indorsement to help sell a product, either at an offered price or at any price, no matter — hire a double and the same effect is achieved. The essential purpose of the statute must be carried out by giving it a commonsense reading which bars easy evasion. If we truly value the right of privacy in a world of exploitation, where every mark of distinctiveness becomes grist for the mills of publicity, then we must give it more than lip service and grudging recognition. Let the word go forth — there is no free ride. The commercial hitchhiker seeking to travel on the fame of another will have to learn to pay the fare or stand on his own two feet.
There are many aspects of identity. A person may be known not only by objective indicia — name, face, and Social Security number — but by other characteristics as well — voice, movement, style, coiffure, typical phrases, as well as by his or her history and accomplishments. Thus far, the Legislature has accorded protection only to those aspects of identity embodied in name and face. Imitators are free to simulate voice or hairdo, or characteristic clothing or accessories, and writers to comment on and actors to re-enact events. No one is free to trade on another’s name or appearance and claim immunity because what he is using is similar to but not identical with the original.
Defendant, Barbara Reynolds, protests that she cannot be prevented from using her own face. Where, however, that use is done in such a way as to be deceptive or promote confusion, that use can be enjoined. The use of one’s own name can be restrained. (See Sullivan v Sullivan Radio & T.V., 1 AD2d 609; David B. Findlay, Inc. v Findlay, 18 NY2d 12, cert den 385 US 930; Higgins Co. v Higgins Soap Co., 144 NY 462; Harvey Mach. Co. v Harvey Aluminum Corp., 9 Misc 2d 1078.) Even variants of a name can be enjoined where confusion may ensue. (Sullivan v Sullivan *613 Radio & T.V., supra, p 611; Astor v Williams, 1 Misc 2d 1026, affd 272 App Div 1052; Albro Metal Prods. Corp. v Alper, 281 App Div 68.) Similarly, it appears to me, the use of one’s own picture can be limited if it is contrived to convey the appearance of someone else — someone much better known. Barbara Reynolds was an unknown secretary. Her appearance at the “wedding” of the Diors would not have made it “legendary”. Provide her, however, with the appropriate makeup, hairdo, accessories and expression and behold — she is the very image of one of the most instantly recognizable and most respected women in the world — a legend in her own time. Norman Mailer, writing in the December, 1983 issue of Esquire magazine on “Fifty Who Made the Difference”, so characterized plaintiff: “Jackie Kennedy Onassis is not merely a celebrity, but a legend. Not a legend, but a myth. No, more than a myth. She is now an historic archetype, virtually a demiurge.” (P 186.) It is the apparent presence of the Jacqueline Kennedy Onassis figure which makes the event “legendary”, and endows it with the qualities of charisma, sophistication, elegance, trend-setting and uniqueness which the advertising campaign seeks to convey. The juxtaposition of the counterfeit figure just behind the real-life figures of a veteran actress, a television personality, and a well-known model lends to the whole ensemble an air of verisimilitude and accentuates the grievance, for it imparts an aura of authenticity to the trumped-up tableau.
Some of the contentions raised , by the defendants are palpably feeble, for example, that there is a recognized exception for artistic as distinguished from commercial endeavors, and that defendant Barbara Reynolds is somehow going to be impeded in her artistic career. While some imitators may employ artistry in the use of voice, gesture and facial expression, a mere similarity of features is no more artistry than the mimicry of the Monarch butterfly by its lookalike, the Viceroy butterfly. To paint a portrait of Jacqueline Kennedy Onassis is to create a work of art; to look like Jacqueline Kennedy Onassis is not. Miss Reynolds may capitalize on the striking resemblance of facial features at parties, television appearances, and dramatic works, but not in commercial advertisements. Similarly, *614 defendant Ron Smith Celebrity Look-Alikes can market its clients for fun and profit in various areas, but may not capitalize on natural resemblance to a well-known person for trade or advertisement. No one has an inherent or Constitutional right to pass himself off for what he is not.
The fact that even as between people who resemble one another there are variances and points of dissimilarity is of no moment. It is the over-all impression being made that counts. The statute necessarily contemplates that a depiction may not be precise, for the words “portrait or picture” comprehend a sketch, a cartoon, or a caricature which selectively omits some features and accentuates others. There are then points of resemblance and points of difference and distortion, but if done well there is instant recognition. What difference if a sketch is used instead of a lookalike model in connection with a commercial promotion? The end result is the same — trading on the name or features of another and the unwarranted commercial exploitation of a person who has not consented to be commercially exploited.
Little more heed need be given to the contention that somehow this advertisement is privileged as a protected form of free speech. It deals with the sale of goods, and not with the promulgation of ideas. “The factual reporting of newsworthy persons and events is in the public interest and is protected. The fictitious is not.” (Spahn v Julian Messner, Inc., 18 NY2d 324, 328.)
Similarly, the notion that having Jacqueline Kennedy Onassis attend the wedding of the Diors is “no more than a touch of humor” wholly incidental to the commercial message and therefore permissible. (Reference is also made in this regard to the presence of a model resembling the late General de Gaulle as part of the “romp”, but only part of his nose and chin are visible at the cropped left edge of the picture, and he is not readily recognizable.) The fact that plaintiff is a public figure permits comment or photography concerning her, or even cartoons or caricatures. She may be shown as a character in re-enactments of the recent past, favorably or unsympathetically. But, as a public figure she has not forfeited her right of privacy and does not become a subject for commercial exploitation. (Reilly v *615 Rapperswill Corp., 50 AD2d 342.) Whether she is an appropriate figure for social satire is an open question. (See University of Notre Dame v Twentieth Century-Fox Film Corp., 22 AD2d 452, supra.) As this court had occasion to say in Salomone v Macmillan Pub. Co. (97 Misc 2d 346, 349-350, revd on other grounds 77 AD2d 501), “Humor is a protected form of free speech, just as much to be given full scope, under appropriate circumstances, as the political speech, the journalistic exposé, or the religious tract.” However, “the mere assertion that a statement was meant to be funny does not automatically absolve the utterer. Humor is intensely subjective. Blank looks or even active loathing may be engendered by a statement or cartoon that evokes howls of laughter from another. What is amusing or funny in the eyes of one person may be cruel and tasteless to someone else. There is always a thin line between laughter and tears. Risibility and sensitivity must go hand in hand.” (Supra, p 350.) The question of whether a matter is harmless humor or cruel and vicious derision may be for the trier of facts, but where, as here, the humor allegedly employed is solely in connection with promoting the sale of goods (some of our best commercials are tongue in cheek), no issue of fact is presented as to a privileged use.
It is somewhat ironic that the principal defendant, Christian Dior — New York, Inc., should be advocating the permissibility of passing off the counterfeit as a legitimate marketing device, when it (or its predecessor) has itself vigorously policed the market to prevent persons by fraud and deception obtaining the fruits of another’s labors and using them commercially. (Dior v Milton, 9 Misc 2d 425, affd 2 AD2d 878.) There plaintiff complained bitterly (and effectively) that there had been a misappropriation of its name and reputation. Now the shoe is on the other foot.
In essence, this court finds on the undisputed facts, that plaintiff’s identity was impermissibly misappropriated for the purposes of trade and advertising, and that it makes no difference if the picture used to establish that identity was genuine or counterfeit. The violation being clear, plaintiff is entitled to preliminary injunctive relief, but not in as broad a form as she seeks. The advertisement having been published, it is not subject to recall. (Albert v New York *616 Tel. Co., 28 Misc 2d 296, affd 11 AD2d 656.) Plaintiff is to be reassured against any further publication, but she is not entitled to obtain possession of all the prints, plates, and negatives used in preparing the ad. Miss Reynolds may be enjoined only from appearing in commercial advertisements masquerading as the plaintiff. If plaintiff claims she has been damaged by the publication of the advertisement, she can pursue those claims when the matter is set down for trial.
In view of the fact that the court has found ample basis for the granting of injunctive relief under the right of privacy laws, it is unnecessary at this time to reach the question proffered as to violation of her rights of publicity. While there would appear to be serious doubts as to whether such a right is recognized by the State courts in the common law of New York (see Brinkley v Casablancas, 80 AD2d 428, 435; Wojtowicz v Delacorte Press, 43 NY2d 858, 860; Frosch v Grosset & Dunlap, 75 AD2d 768), the question of the scope and applicability of such a claimed right to the facts presented here need not be here resolved. Plaintiff’s statutory right to privacy has been trampled upon, and that is all that need be shown. The motion is granted; the cross motion is denied.