**NEW YORK MAGAZINE, A DIVISION OF PRIMEDIA MAGAZINES, INC., Plaintiff–Appellee,**

v.

**The METROPOLITAN TRANSPORTATION AUTHORITY and The City of New York, Defendants–Appellants.**

No. 1645, Dockets 97–9511, 97–9519.

United States Court of Appeals, Second Circuit

Argued Dec. 15, 1997.

Decided Jan. 22, 1998.

district court at that stage—can be brought be- fore the district court on remand.

Marcia B. Paul, New York City (Gregory J. Ikonen, Kay, Collyer & Boose, LLP, of counsel), for Plaintiff–Appellee.

Kenneth A. Plevan, New York City (Jeremy A. Berman, Esther S. Trakinski, Skadden, Arps, Slate, Meagher & Flom, LLP, of counsel), for Defendant–Appellant The Metropolitan Transportation Authority.

Elizabeth I. Freedman, New York City (Jeffrey D. Friedlander, Acting Corporation Counsel of the City of New York, Leonard Koerner, John R. Low–Beer, and Yair S. Goldstein, of counsel), for Defendant–Appellant The City of New York.

(David Zwiebel, Morton M. Avigdor, New York City), for Amicus Curiae Agudath Israel of America.

(Victor A. Kovner, Alexandra Nicholson, Lankenau Kovner Kurtz & Outten, LLP; Slade R. Metcalf, Squadron, Ellenoff, Plesent & Sheinfeld, LLP; Jerry S. Birenz, Sabin, Bermant & Gould; Yvette Miller, Gruner & Jahr USA Publishing, New York City), for Amicus Curiae Magazine Publishers of America, Inc.

(Arthur N. Eisenberg, Norman Siegel, Christopher Dunn, New York City), for Amicus Curiae New York Civil Liberties Union Foundation.

Before: OAKES, CARDAMONE and CALABRESI, JJ.

OAKES, Senior Circuit Judge:

This case presents the question whether the Metropolitan Transportation Authority ["MTA"], a public benefit corporation created by the State of New York, may refuse to display on its buses an advertisement that refers by first name to the Mayor of New York City, based on MTA's belief that the advertisement violates § 50 of the New York Civil Rights Law. Plaintiff New York Magazine, a division of Primedia Magazines, Inc. [collectively, "New York Magazine"], brought suit requesting preliminary and permanent injunctive relief against defendants MTA and the City of New York [the "City"], claiming defendants violated New York Magazine's rights as secured by the First and Fourteenth Amendments to the U.S. Constitution, after MTA discontinued displaying its advertisement [the "Advertisement"]. New York Magazine also requested preliminary injunctive relief against the City for tortious interference with contract. The Advertisement featured the New York Magazine logo and read, "Possibly the only good thing in New York Rudy hasn't taken credit for." New York Magazine had contracted with MTA's agent to have the Advertisement placed on the outside of MTA buses; MTA removed the Advertisement from its buses after receiving a complaint from the Mayor's office that the Advertisement violated the Mayor's rights under § 50. The U.S. District Court for the Southern District of New York, Shira A. Scheindlin, *Judge,* granted Plaintiff New York Magazine preliminary injunctive relief on its claim brought under 42 U.S.C. § 1983, enjoining the defendants from refusing to display the Advertisement, finding that New York Magazine showed a substantial likelihood of success on the merits of its claim that MTA violated its rights under the First and Fourteenth Amendments to the U.S. Constitution. Both defendants appeal, claiming that the advertising space at issue constitutes a non-public forum, so that the MTA's action of discontinuing the Advertisement need only be reasonable, non-discriminatory and not based on the viewpoint expressed. They also argue that the District Court mis-

applied the test applicable to commercial speech in a designated public forum, because the governmental interest that justifies discontinuing the Advertisement, obeying § 50 of the New York Civil Rights Law, is substantial, and because refusing to display the Advertisement directly advances the governmental interest without being more extensive than necessary to serve that interest. We affirm the district court's order granting preliminary injunctive relief against MTA, but we vacate the order to the extent it applies to the City, and dismiss New York Magazine's claims against the City as failing to present a case or controversy.

## I. Facts

The parties do not dispute the material facts. New York Magazine, a weekly publication distributed throughout New York City and elsewhere, regularly and frequently carries news reports and political commentary regarding the City of New York, its politicians, and other public figures, as well as other features and stories of general interest. MTA is a public benefit corporation created in 1965 by New York state law that owns and operates the majority of the public buses in New York providing daily local transportation. MTA raises revenue for its operation, in part, by leasing advertising space on the buses; it solicits advertisers and enters into contractual agreements for lease of its advertising space through an agent, Transportation Displays Incorporated ["TDI"]. In September of 1997, TDI, on behalf of MTA, and New York Magazine entered into a contract [the "Agreement"]. MTA agreed to display the Advertisement, as part of a series of three, on the sides of seventy-five of its buses, and New York Magazine agreed to pay $85,000 for the series. The Advertisement was to run from just before Thanksgiving to December 31, 1997, and possibly for some time during January, 1998. The Agreement provided that "[a]ll advertising copy is subject to approval of TDI and the Transportation Facility concerned as to character [and] text...." New York Magazine agreed to "indemnify and save harmless TDI and [MTA] against any liability to which

[they] may be subjected by reason of the advertising required under this contract."

New York Magazine provided TDI seventy-five copies of the Advertisement before November 15, 1997, in accordance with the Agreement. Neither TDI nor MTA objected to the Advertisement at that time, and MTA began posting the Advertisement around November 24, 1997, according to schedule. At some point in the following week, Mayor Giuliani's office called the MTA and asked that the Advertisement be removed, objecting to the use of the Mayor's name to promote a commercial product, claiming this violated § 50 of the New York Civil Rights Law. Section 50 provides, "A person, firm or corporation that uses for advertising purposes, or for the purposes of trade, the name, portrait or picture of any living person without having first obtained the written consent of such person, . . . is guilty of a misdemeanor." N.Y.Civ.Rights Law § 50 (McKinney 1997). Section 51 provides that "[a]ny person whose name, portrait or picture is used within this state for advertising purposes or for the purposes of trade without . . . written consent . . . may maintain an equitable action in the supreme court of this state against the [party] so using his name, portrait or picture . . . and may also sue and recover damages for any injuries sustained by reason of such use. . . ." *Id.* § 51 (footnote omitted). The statute provides that the jury may award exemplary damages in its discretion if the defendant violated § 50 knowingly. *Id.*

MTA adopted standards governing its acceptance of advertising by a board resolution dated March 24, 1994, and amended those standards effective September 30, 1997 [the "Standards"].[1] The Standards impose no restriction on political speech. The Standards prohibit, inter alia, the display of any advertisement that "violates New York Civil Rights Law § 50." Standards § (a)(vii) (1994). The Standards also set forth procedures by which advertisements may be reviewed for compliance, requiring the MTA contractor (here, TDI) to review every advertisement to determine whether it falls within

a prohibited category. If the contractor believes a submitted advertisement violates the Standards, the contractor is required to provide the advertiser with a copy of the Standards and notify the advertiser that the advertisement has been determined to violate the Standards, the reasons for that determination, and that the advertiser has a right to request a prompt review. *Id.* § (c)(i) (amended 1997). MTA concedes that TDI failed to follow these procedures with respect to the Advertisement.

The district court granted New York Magazine the preliminary injunctive relief it requested after consideration of exhibits and memoranda of law from all of the parties, and after conducting a hearing, which consisted of argument from all counsel. MTA and the City moved for a stay pending appeal of this action, which was denied, both in the district court and in this court.

## II. Discussion

### A. Standard of review

■ We review the district court's grant of a preliminary injunction for abuse of discretion, although we review its determinations of law de novo. *Malkentzos v. DeBuono,* 102 F.3d 50, 54 (2d Cir.1996); *County of Seneca v. Cheney,* 12 F.3d 8, 11 (2d Cir.1994). If the District Court has based its decision on an error of law, it has ipso facto abused its discretion. *Cheney,* 12 F.3d at 11; *see* Henry J. Friendly, *Indiscretion About Discretion,* 31 Emory L.J. 747, 776–78 (1982).

### B. Standing against the City

■ The district court denied New York Magazine's motion for preliminary injunction with respect to its claim against the City for tortious interference with contract, and New York Magazine claims no error with respect to that denial. The district court issued its injunction for New York Magazine's claim under § 1983 against both defendants: "Defendants are enjoined and restrained from refusing to display, or restricting or limiting

---

1. The district court noted that the parties disputed whether the 1997 amendments to the regulations applied to the Agreement, which was executed before the effective date of the 1997 amendments. We do not need to decide the issue, because our decision does not depend on whether the amendments applied.

the display of Primedia's advertisements on [MTA] buses pursuant to its December, 1997 contract with TDI." *New York Magazine v. Metropolitan Transit Auth.,* 987 F.Supp. 254, 270 (S.D.N.Y.1997) (order granting preliminary injunction). However, New York Magazine ·lacks standing· to assert a claim against the City for injunctive relief. Article III of the U.S. Constitution requires that a "case" or "controversy" be present in order to confer jurisdiction on federal courts for a particular claim; standing to sue is an essential part of that requirement. *See Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 2204, 45 L.Ed.2d 343 (1975). Even assuming that the City, acting through the office of the Mayor, violated New York Magazine's rights under the First Amendment by contacting MTA and asking that the Advertisement be removed, New York Magazine does not have standing to request injunctive relief against the City. In *City of Los Angeles v. Lyons,* 461 U.S. 95, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983), the Supreme Court held that a plaintiff who may have been illegally choked by police, who would have had standing to state a claim for damages, did not have standing to seek injunctive relief against the police. *Id.* at 110, 103 S.Ct. at 1669–70; *see also Levin v. Harleston,* 966 F.2d 85, 90 (2d Cir.1992). In *Lyons,* the fact "[t]hat Lyons may have been illegally choked by the police . . ., while presumably affording Lyons standing to claim damages against the individual officers and perhaps against the City, does nothing to establish a real and immediate threat that he would again be stopped ·. . by an officer or officers who would illegally choke him. . . ." *Lyons,* 461 U.S. at 105, 103 S.Ct. at 1667. The Mayor's office has informed MTA of its feelings about the Advertisement; New York Magazine has not alleged any continuing action by the City, nor any real and immediate threat that the Mayor's office will do anything further to interfere with MTA's display of the Advertisement.

Because New York Magazine's complaint against the City seeks injunctive relief only, we vacate the district court's order to the extent it applies to the City, and dismiss New York Magazine's claim against the City.

**C. Standard for granting a preliminary injunction**

MTA claims it took its action pursuant to the Standards. Where a party seeks a preliminary injunction to stay "government action taken in the public interest pursuant to a statutory or regulatory scheme," that party must show a likelihood of success on the merits and irreparable harm. *Jolly v. Coughlin,* 76 F.3d 468, 473 (2d Cir. 1996) (quoting *Able v. United States,* 44 F.3d 128, 131 (2d Cir.1995)). The district court required New York Magazine to show not only a likelihood, but a "clear" or "substantial" likelihood, of success on the merits, reasoning that the order requested by New York Magazine is a mandatory injunction, one that seeks to alter, rather than maintain, the status quo. *New York Magazine,* 987 F.Supp. at 259 (citing *Jolly,* 76 F.3d at 473). We do not need to decide whether the district court correctly held New York Magazine to the standard appropriate for mandatory, as opposed to prohibitive, injunctions, because New York Magazine meets the more stringent requirement. As for irreparable harm, the district court noted that if New York Magazine were correct as a matter of law that MTA's action unlawfully abridged its freedom of speech as guaranteed by the First Amendment, New York Magazine established irreparable harm. The " 'loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.' " *Deeper Life Christian Fellowship, Inc. v. Board of Educ.,* 852 F.2d 676, 679 (2d Cir.1988) (quoting *Elrod v. Burns,* 427 U.S. 347, 373, 96 S.Ct. 2673, 2689, 49 L.Ed.2d 547 (1976)). As the district court correctly found that the facts presented constitute a violation of New York Magazine's First Amendment freedoms, New York Magazine established a fortiori both irreparable injury and a substantial likelihood of success on the merits.

**D. The First Amendment**

To state a claim under 42 U.S.C. § 1983, "a plaintiff must allege (1) that the challenged conduct was attributable at least in part to a person acting under color of state

law, and (2) that such conduct deprived the plaintiff of a right, privilege or immunity secured by the Constitution or laws of the United States." *Eagleston v. Guido,* 41 F.3d 865, 876 (2d Cir.1994) (quoting *Dwares v. City of New York,* 985 F.2d 94, 98 (2d Cir. 1993)). MTA does not argue that the district court erred in determining that it qualifies as a person acting under color of state law for purposes of § 1983. Therefore, the only question presented is whether MTA's conduct in removing the Advertisement from the exterior advertising space of the its buses deprived New York Magazine of a First Amendment right.

The district court determined that the Advertisement, although it contained political commentary, constitutes commercial speech. *New York Magazine,* 987 F.Supp. at 262–63. It then determined that the advertising space at issue is a designated public forum, so that restrictions upon speech made there must be subject to the strictest available scrutiny for the kind of speech at issue. *Id.* at 264–65. The district court then applied the test dictated by the Supreme Court in *Central Hudson Gas & Electric Corp. v. Public Service Commission,* 447 U.S. 557, 566, 100 S.Ct. 2343, 2351, 65 L.Ed.2d 341 (1980), and found that the government interest in upholding § 50 was not directly advanced by discontinuing the Advertisement, because § 50 would not actually prohibit the Advertisement. *New York Magazine,* 987 F.Supp. at 268–69.

MTA argues that the district court erred in analyzing its determination to discontinue the Advertisement under the standard appropriate to commercial speech made in a designated public forum. It argues that the outside of an MTA bus actually constitutes a non-public forum, so that we should only require that MTA's action be reasonable, non-discriminatory, and not based on the speaker's viewpoint.

### 1. The Forum

 Where the government seeks to restrict speech by restricting access to its own property, as it does here, the kind of scrutiny to which we subject the restriction depends on how we categorize the property as a forum for speech. *See International Soc'y for Krishna Consciousness, Inc. v. Lee,* 505 U.S. 672, 678–79, 112 S.Ct. 2701, 2705, 120 L.Ed.2d 541 (1992); *United States v. Kokinda,* 497 U.S. 720, 726, 110 S.Ct. 3115, 3119, 111 L.Ed.2d 571 (1990) (plurality opinion); *Cornelius v. NAACP Legal Defense & Educ. Fund, Inc.,* 473 U.S. 788, 800, 105 S.Ct. 3439, 3448, 87 L.Ed.2d 567 (1985); *Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 45–46, 103 S.Ct. 948, 944–955, 74 L.Ed.2d 794 (1983); *see also Lehman v. City of Shaker Heights,* 418 U.S. 298, 302–03, 94 S.Ct. 2714, 2717, 41 L.Ed.2d 770 (1974). The Supreme Court has created three categories of government property, and announced standards for reviewing government restriction of speech according to those categories. *See Perry,* 460 U.S. at 45–46, 103 S.Ct. at 954–55. A traditional public forum is one that " 'by long tradition or by government fiat ha[s] been devoted to assembly and debate.' " *General Media Communications, Inc. v. Cohen,* 131 F.3d 273, 278 (2d Cir.1997) (quoting *Cornelius,* 473 U.S. at 802, 105 S.Ct. at 3449 (internal citation omitted)). The second kind of public forum is the designated public forum, a place the government has opened for use by the public for expressive activity. *Id.* at 278–79 (citing *Perry,* 460 U.S. at 45, 103 S.Ct. at 955). In both traditional public fora and designated public fora, content-based regulations survive only if "narrowly drawn to achieve a compelling [governmental] interest." *Id.* at 278 (citing *Lee,* 505 U.S. at 678, 112 S.Ct. at 2705). All remaining government property constitutes a non-public forum. The government may limit speech in a non-public forum if the limitation is reasonable, and not based on the speaker's viewpoint. *Perry,* 460 U.S. at 46, 103 S.Ct. at 955; *Lee,* 505 U.S. at 678–79, 112 S.Ct. at 2705.[2]

**2.** The Second Circuit has referred to the "limited public forum" as a sub-category of the designated public forum, where the government "opens a non-public forum but limits the expressive activi-

ty to certain kinds of speakers or to the discussion of certain subjects." *Travis v. Owego–Apalachin Sch. Dist.,* 927 F.2d 688, 692 (2d Cir.1991); *see Deeper Life,* 852 F.2d at 679–80. Exclusions

No one in this case argues that the advertising space at issue is a traditional public forum; New York Magazine argues it is a designated public forum, and MTA and the City both argue the space is a non-public forum. The Court has made it clear that whether government property is designated a public forum or not depends on the government's intended purpose for the property. "The government does not create a public forum by inaction or by permitting limited discourse, but only by intentionally opening a nontraditional forum for public discourse." *Cornelius,* 473 U.S. at 802, 105 S.Ct. at 3449. In order to determine the government's intention with respect to property in which the government has accepted some speech, the Court has examined the nature of the property and its compatibility with expressive activity, as well as the nature of the restraints on speech imposed. *Id.* at 802–04, 105 S.Ct. at 3449–3451.

In determining the nature of the property, the Court has examined whether the government opened the property for speech in its "proprietary capacity," for the purpose of raising revenue or facilitating the conduct of its own internal business; if so, the Court has considered the forum non-public and allowed restrictions subject only to the test of reasonableness. *See Lehman,* 418 U.S. at 303, 94 S.Ct. at 2717 ("Here, we have no open spaces, no meeting hall, park, street corner, or other public thoroughfare. Instead, the city is engaged in commerce."); *Lee,* 505 U.S. at 678, 112 S.Ct. at 2705 ("Where the government is acting as a proprietor, managing its internal operations, rather than acting as lawmaker with the power to regulate or license, its action will not be subjected to the heightened review to which its actions as a lawmaker may be subject."). In *Cornelius,* the Court found that the government had not designated the Combined Federal Campaign, a charity drive aimed at federal employees, to be a public forum because the purpose of its creation had been to minimize disruption of business "by *lessening* the amount of expressive activity occurring on federal proper-

ty." 473 U.S. at 805, 105 S.Ct. at 3450. The government acted in its capacity as an employer to make its workplace more efficient; the point had been not to encourage speech, but to *reduce* the amount of speech that had been taking place on government property. In *Perry,* the Court determined that public school mail facilities did not constitute a designated public forum where the " 'normal and intended function [of the school mail facilities] is to facilitate internal communication of school-related matters to the teachers.' " *Perry,* 460 U.S. at 47, 103 S.Ct. at 955 (alternation in original) (citation omitted). Where the government acted for the purpose of benefitting the public, on the other hand, the Court has found a public forum. *See Widmar v. Vincent,* 454 U.S. 263, 267–69, 102 S.Ct. 269, 273–74, 70 L.Ed.2d 440 (1981) (finding that a state university that had an express policy of making its meeting facilities available to registered student groups had created a public forum); *Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546, 555, 95 S.Ct. 1239, 1245, 43 L.Ed.2d 448 (1975) (finding a designated public forum where the city leased a theater dedicated to expressive activities).

In determining the government's intent for a forum, the Court has examined not only the characteristics of the forum, but also the policies by which it governed the use of the forum. *See Cornelius,* 473 U.S. at 804, 105 S.Ct. at 3450. MTA argues that restricting access to the forum through its Standards evidences an intent not to create a public forum. *See Christ's Bride Ministries, Inc. v. Southeastern Pa. Transp. Auth.,* 937 F.Supp. 425, 431 (E.D.Pa.1996) (finding that subway advertising space was not a public forum, noting that the transportation authority "presented ample evidence that it retains firm control over the types of advertising which may be displayed in its stations. It has rules and standards."). However, it cannot be true that if the government excludes any category of speech from a forum through a rule or standard, that forum becomes ipso facto a

of speech under this category are treated the same as exclusions under non-public fora: "Under the limited public forum analysis, … exclusion of uses … need only be reasonable and

viewpoint-neutral to pass constitutional muster." *Id.* (citations omitted); *see also Fighting Finest, Inc. v. Bratton,* 95 F.3d 224, 229 (2d Cir.1996).

non-public forum, such that we would examine the exclusion of the category only for reasonableness. This reasoning would allow every designated public forum to be converted into a non-public forum the moment the government did what is supposed to be impermissible in a designated public forum, which is to exclude speech based on content. *See Cornelius*, 473 U.S. at 813–814, 105 S.Ct. at 3455 (Blackmun, J. dissenting). We cannot interpret the Supreme Court's jurisprudence such that it would eviscerate the Court's own articulation of the standard of scrutiny applicable to designated public fora.

Although the Court undeniably has considered excluded categories of speech when deciding whether the government intended to designate a public forum, it did so not because the exclusion of categories of speech creates a non-public forum, but because the *nature* of the excluded categories sheds light on whether the government was acting primarily as a proprietor or a regulator. "The decision of the Government to limit access to the [forum] is not dispositive in itself; instead, it is relevant for what it suggests about the Government's intent in creating the forum." *Id.* at 805, 105 S.Ct. at 3450. In *Lehman,* the Court found the exclusion of political advertising not to determine the nature of the forum, but to support its determination that the government was acting in a proprietary capacity: "Revenue earned from long-term commercial advertising could be jeopardized by a requirement that short-term candidacy or issue-oriented advertisements be displayed on car cards." *Lehman,* 418 U.S. at 304, 94 S.Ct. at 2718. In *Lebron v. National Railroad Passenger Corp.,* 69 F.3d 650, 656–57 (2d Cir.), *amended by* 89 F.3d 39 (2d Cir.1995), we considered the consistent exclusion of political speech from a particular billboard space in Penn Station not to prove that we should only demand of that exclusion that it be reasonable, but to prove that the government opened the space in its capacity as a commercial actor. Disallowing political speech, and allowing commercial speech only, indicates that making money is the main goal. Allowing political speech,

conversely, evidences a general intent to open a space for discourse, and a deliberate acceptance of the possibility of clashes of opinion and controversy that the Court in *Lehman* recognized as inconsistent with sound commercial practice. The district court thus correctly found that the advertising space on the outside of MTA buses is a designated public forum, because the MTA accepts both political and commercial advertising. *See Paulsen v. County of Nassau,* 925 F.2d 65, 70 (2d Cir.1991) (finding designated public forum where the government "failed to demonstrate a consistent practice of limiting noncommercial, expressive activity"); *Lebron v. Washington Metropolitan Area Transit Auth.* ("*WMATA*"), 749 F.2d 893, 896 (D.C.Cir.1984) ("There is no ... question that WMATA has converted its subway stations into public fora by accepting ... political advertising.").

Not only do MTA Standards permit political and other non-commercial advertising generally, the Standard by which MTA attempts to justify refusing to show the Advertisement supports the conclusion that MTA was operating in its capacity as a regulatory agency when it did so. Unlike the exclusions that contributed to orderly internal business procedures in *Perry* or *Cornelius,* the MTA's exclusion is based on a general interest in upholding the law, and a corollary interest in avoiding litigation. The MTA articulates its interest as "seeing to it that commercial advertising appearing on its buses complies with Section 50, the statutory codification of the[ ] rights [of privacy and publicity.]" There is no commercial reason why MTA has any special interest in the policy behind § 50; MTA's interest is only the interest in upholding the law because it is the law.[3]

Given that MTA's Standards allow both commercial and political speech, and given that the Standard that MTA used to justify discontinuing the Advertisement supports a legal characterization of MTA's action as regulatory, we conclude that the advertising space on the outside of MTA buses is a designated public forum.

---

3. Although the interest in avoiding litigation could be characterized as commercial, the indemnity clause of the Agreement, which provides that the advertiser bears full liability for any damages incurred in litigation, fully protects that interest, as we discuss below.

## 2. Prior Restraint

■■■■ Having determined that MTA intended to designate its advertising space as a public forum, we review MTA's actions, which it took pursuant to regulations, as an exercise of a prior restraint. *See Southeastern Promotions,* 420 U.S. at 552–57, 95 S.Ct. at 1243–46; *Lebron v. WMATA,* 749 F.2d at 896 (having determined that the WMATA had designated its subway stations as public fora, reasoned that "[b]ecause WMATA, a government agency, tried to prevent Mr. Lebron from exhibiting his poster 'in advance of actual expression,' WMATA's action can be characterized as a 'prior restraint,' which comes before us bearing a presumption of unconstitutionality") (internal citations omitted). "In order to be held lawful, [the government agency's] action, first, must fit within one of the narrowly defined exceptions to the prohibition against prior restraints, and, second, must have been accomplished with procedural safeguards that reduce the dangers of suppressing constitutionally protected speech." *Southeastern Promotions,* 420 U.S. at 559, 95 S.Ct. at 1247 (citing *Bantam Books v. Sullivan,* 372 U.S. 58, 71, 83 S.Ct. 631, 639, 9 L.Ed.2d 584 (1963)). These safeguards require, inter alia, that "the burden of instituting judicial proceedings, and of proving that the material is unprotected, must rest on the censor," and that "a prompt final judicial determination must be assured." *Id.* at 560, 95 S.Ct. at 1247.

■■■■ Although the Supreme Court has indicated that commercial speech may qualify as one of the exceptions to the bar on prior restraints, *see Central Hudson,* 447 U.S. at 571 n. 13, 100 S.Ct. at 2354 n. 13, we see no reason why the requirement of procedural safeguards should be relaxed whether speech is commercial or not. We consider prior restraints to be particularly abhorrent to the First Amendment in part because they vest in government agencies the power to determine important constitutional questions properly vested in the judiciary. Laurence H. Tribe, *American Constitutional Law,* § 12–38, at 1056–57 (2d ed. 1988). This case aptly demonstrates that where there are both commercial and political elements present in speech, even the determination whether speech is commercial or not may be fraught with ambiguity and should not be vested in an agency such as MTA. While the Advertisement served to promote the sales of a magazine, it just as clearly criticized the most prominent member of the City's government on an issue relevant to his performance of office, subtly calling into question whether the Mayor is actually responsible for the successes of the City for which he claims credit. While we accord somewhat lowered scrutiny to government restrictions on the right to propose commercial transactions, *see Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council,* 425 U.S. 748, 771 n. 24, 96 S.Ct. 1817, 1830 n. 24, 48 L.Ed.2d 346 (1976), protecting the right to express skeptical attitudes toward the government ranks among the First Amendment's most important functions. *See* James L. Oakes, *The Doctrine of Prior Restraint Since the Pentagon Papers,* 15 U.Mich.J.L.Reform 497, 499 (1982) ("[T]he doctrine of prior restraint has promoted responsibility in government by ensuring that the Government does not suppress exposure of its errors, deceptions, or embarrassments."). We need not decide whether the Advertisement is actually commercial speech or core-protected speech; the difficulty of the question alone convinces us that the requirement of procedural safeguards in a system of prior restraints should not be loosened even in the context of commercial speech. "Because the line between unconditionally guaranteed speech and speech that may be legitimately regulated is a close one, the 'separation of legitimate from illegitimate speech calls for ... sensitive tools.'" *Southeastern Promotions,* 420 U.S. at 561, 95 S.Ct. at 1248 (quoting *Speiser v. Randall,* 357 U.S. 513, 525, 78 S.Ct. 1332, 1342, 2 L.Ed.2d 1460 (1958)). Some circuits have explicitly indicated that the requirement of procedural safeguards in the context of a prior restraint indeed applies to commercial speech. *See, e.g., Desert Outdoor Adver. v. City of Moreno Valley,* 103 F.3d 814, 818 (9th Cir.1996); *In re Search of Kitty's East,* 905 F.2d 1367, 1371–72 & n. 4 (10th Cir.1990).

In fact, the test that the Supreme Court regularly applies to commercial speech supports continuing to require procedural safe-

guards for prior restraints even where commercial speech is involved. *Central Hudson,* 447 U.S. at 566, 100 S.Ct. at 2351. That test requires us to consider "whether the regulation ... is not more extensive than is necessary to serve [the asserted governmental] interest." *Id.* If it is more extensive than necessary, the government's action fails. A prior prohibition of the Advertisement is certainly more extensive than is necessary to serve the governmental interest asserted here, particularly where this court found, when denying MTA's motion for a stay, that requiring MTA to display the Advertisement would not result in irreparable harm to MTA. In other words, we have already decided that applying § 50 before the Advertisement is displayed is more extensive than necessary. Because the advertising space is a designated public forum, MTA may not enforce § 50 through its advertising policy any more than a government agency, acting without procedural safeguards, could screen advertisements for violations of § 50 that private bus companies wished to display. Section 51 already provides remedies for violation of § 50, which may be asserted by the person who feels his rights are affected. If § 50 does protect Mayor Giuliani from the use of his name in this Advertisement, he may seek redress under § 51; he will not be awarded injunctive relief absent a showing that he will be irreparably harmed without it. Refusing to display the Advertisement is also more extensive than necessary to further MTA's corollary interest in avoiding litigation; that interest is adequately furthered by the indemnity clause of the Agreement. In fact, in pursuit of the interest in avoiding litigation, it is clear that MTA would have been wise to rely on its indemnity clause, seeing that we write precisely because imposing a prior restraint has failed to further that interest.

### III. Conclusion

For these reasons, we affirm the district court's grant of preliminary injunctive relief against MTA.

CARDAMONE, Circuit Judge, Dissenting:

My respected colleagues have circled the wagons on this appeal, seeing the govern-ment regulators as though they were a long line of raiders poised on a nearby hilltop threatening to swoop down and attack innocent advertisers attempting to exercise their constitutional right to free speech. The appeal appears to me in a much less menacing light. Seeing no arrow aimed at the heart of the First Amendment, I must respectfully dissent. Stripped of the baggage of its highly-visible parties, this case simply involves commercial speech in a forum where the MTA's regulations may properly and did reasonably regulate such speech.

The MTA's 1994 advertising standards, which are the subject of this appeal, contain eight limitations on what an advertiser may display on MTA buses. Such advertisement may not: (i) be false, misleading or deceptive, (ii) promote unlawful or illegal goods or services, (iii) imply an endorsement by the MTA of the product or service, (iv) contain obscene material, as defined by New York Penal Law § 235.00, (v) contain an image or description which if sold to a minor would violate New York Penal Law § 235.21, (vi) contain an image or description that would violate New York Penal Law § 245.11, (vii) be libelous or violate New York Civil Rights Law, § 50, and (viii) promote tobacco.

#### I

New York Magazine's advertisement plainly violates § 50 of New York's Civil Rights Law. Section 50, which has been law in New York for 95 years, makes it a misdemeanor to use, "for advertising purposes or for the purposes of trade, the name, portrait or picture of any living person" without first obtaining that person's written consent. N.Y.Civ.Rights Law § 50 (McKinney 1992); *see Groden v. Random House, Inc.,* 61 F.3d 1045, 1048 (2d Cir.1995). Section 51 of the New York Civil Rights Law provides those injured by such conduct with a cause of action for injunctive relief and damages. *See* N.Y.Civ.Rights Law § 51 (McKinney Supp. 1997–98). Since no common law right to privacy exists in New York, this statute is the only protection individual citizens have against non-consensual invasion of that right. *See Cohen v. Hallmark Cards, Inc.,* 45 N.Y.2d 493, 497 n. 2, 410 N.Y.S.2d 282, 382

N.E.2d 1145 (1978); *see also Arrington v. New York Times Co.*, 55 N.Y.2d 433, 440, 449 N.Y.S.2d 941, 434 N.E.2d 1319 (1982). No one disputes that the use of Mayor Giuliani's name in the subject advertisement was without his consent.

An appropriation of a person's name, portrait or picture violates § 50 only if it is used primarily for trade or advertising purposes. *See Freihofer v. Hearst Corp.*, 65 N.Y.2d 135, 140, 490 N.Y.S.2d 735, 480 N.E.2d 349 (1985). The advertising purposes prong of the statute is implicated where the use of a person's name is for the purpose of soliciting purchasers for defendant's products. *See, e.g., Flores v. Mosler Safe Co.*, 7 N.Y.2d 276, 284, 196 N.Y.S.2d 975, 164 N.E.2d 853 (1959) (holding that defendant safe company which reprinted in advertising circular a newsphoto of a burning building and accompanying news story mentioning plaintiff's name several times could be held liable for such advertising use). New York Magazine made use of the name of New York City's Mayor primarily to attract readers to buy its product. Thus, on its face, § 50 applies. Moreover, the fact that the Mayor is a public figure does not alter this conclusion, for § 50 covers *public*, as well as private, figures. *See Stephano v. News Group Publications, Inc.*, 64 N.Y.2d 174, 183, 485 N.Y.S.2d 220, 474 N.E.2d 580 (1984); *Brinkley v. Casablancas*, 80 A.D.2d 428, 439–41, 438 N.Y.S.2d 1004 (1st Dep't 1981); *Onassis v. Christian Dior–New York, Inc.*, 122 Misc.2d 603, 614–15, 472 N.Y.S.2d 254 (Sup.Ct.N.Y.County 1984), *aff'd*, 110 A.D.2d 1095, 488 N.Y.S.2d 943 (1st Dep't 1985).

In addition, the two exceptions to § 50's application, incidental use and public interest, have no application here. The incidental use exception is for fleeting, *de minimis*, uses. *See, e.g., University of Notre Dame Du Lac v. Twentieth Century–Fox Film Corp.*, 22 A.D.2d 452, 454, 256 N.Y.S.2d 301 (1st Dep't) (plaintiff named on three pages of 143 page book), *aff'd*, 15 N.Y.2d 940, 259 N.Y.S.2d 832, 207 N.E.2d 508 (1965). This exception does not apply because, as New York Magazine admits, the reference to the Mayor is central, not incidental, to the advertisement and its commercial impact.

Nor does the public interest exception govern. That exception does not apply to materials that are "quintessential" advertising. *See Beverley v. Choices Women's Med. Ctr., Inc.*, 78 N.Y.2d 745, 751–53, 579 N.Y.S.2d 637, 587 N.E.2d 275 (1991) (holding that a commercial advertiser may not unilaterally override significant statutory privacy protection by wrapping its message in the cloak of public interest, however commendable that message's educational and informational value). Nor is it relevant, as New York Magazine contends, that the advertisement is satire. *See Onassis*, 122 Misc.2d at 614–15, 472 N.Y.S.2d 254. Although the media is of course entitled to direct humor or satire at a public figure in non-advertising contexts, the unauthorized use of an individual's name in an advertisement is not rendered lawful merely by the addition of humorous social commentary. *See id.* Hence, because neither the incidental use nor public interest exception applies, and no consent was obtained from the person whose name was used, § 50 of the New York Civil Rights Law was violated by this advertisement.

## II

Whether the City of New York can limit access to its property—here a city bus—for purposes of speech depends on the nature of the forum. Restrictions on speech on governmental property traditionally open to the public, like public streets and parks, are subject to strict scrutiny. But a city bus cannot be said to be a quintessential public forum in the same sense as a park or public street.

The MTA operates its bus system as a commercial venture. Thus, this function of government is not conducted in the authority's role of lawmaker, but rather in a proprietary capacity. As such, the transit system has the power to develop reasonable regulations with respect to what kinds of advertising it will accept. *See, e.g., International Soc'y for Krishna Consciousness v. Lee*, 505 U.S. 672, 678–83, 112 S.Ct. 2701, 2705–08, 120 L.Ed.2d 541 (1992) (reasoning that because airport terminals operated by public authorities are commercial establishments, restrictions imposed on expression within them are satisfied by the requirement

of reasonableness). And, even when a public authority opens a forum to some speech, it does not become a public forum unless the authority clearly intends it to be one. *See Cornelius v. NAACP Legal Defense & Educ. Fund,* 473 U.S. 788, 804, 105 S.Ct. 3439, 3450, 87 L.Ed.2d 567 (1985).

Here, since the MTA does accept some political advertising, it must be conceded that City buses are in fact dedicated to some First Amendment uses. However, the City signalled its intent that the sides of buses were not to be considered public *fora* through its regulations, which, among other things, ban advertising that violates § 50 of the New York Civil Rights Law. *See Cornelius,* 473 U.S. at 805, 105 S.Ct. at 3450 ("The decision of the Government to limit access to the [forum] ... is relevant for what it suggests about the Government's intent in creating the forum.").

It is my belief that the sides of MTA buses are a limited public forum that permit some forms of political speech. *See Travis v. Owego–Apalachin Sch. Dist.,* 927 F.2d 688, 692 (2d Cir.1991) ("[I]n a limited public forum, government is free to impose a blanket exclusion on certain types of speech, but once it allows expressive activities of a certain genre, it may not selectively deny access for other activities of that genre."). That does not mean, as the majority apparently believes, that the test of strict scrutiny applies across the board to restrictions on non-political commercial advertising of the kind we have before us. Although bus placards have been dedicated to some First Amendment uses, and may not therefore be said to be a purely nonpublic forum, "regulation of the reserved nonpublic uses would still require application of the reasonableness test." *United States v. Kokinda,* 497 U.S. 720, 730, 110 S.Ct. 3115, 3121, 111 L.Ed.2d 571 (1990); *see also Perry Educ. Assn. v. Perry Local Educators Assn.,* 460 U.S. 37, 47–49, 103 S.Ct. 948, 956–57, 74 L.Ed.2d 794 (1983).

### III

In 1994 the MTA promulgated the written advertising standards referred to above, clearly evincing its intent not to open its advertising space to all comers. In *Lehman*

*v. City of Shaker Heights,* 418 U.S. 298, 94 S.Ct. 2714, 41 L.Ed.2d 770 (1974), the Supreme Court explained that billboards and streetcar signs are thrust upon viewers without their choice—a radio or TV can be turned off, not so a billboard or bus placard. *Id.* at 302, 94 S.Ct. at 2716–17. When a City is engaged in commerce, the Court continued, it need not accept every advertisement offered, but may make reasonable choices with respect to the advertising displayed on its vehicles. *Id.* at 303, 94 S.Ct. at 2717. Such is precisely the situation in the case before us.

Restrictions on expression "can be based on subject matter and speaker identity so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral." *Cornelius,* 473 U.S. at 806, 105 S.Ct. at 3451. The regulation excluding advertisements that violate New York Civil Rights Law § 50 is a reasonable exclusion, and one that is viewpoint neutral. The MTA declares that these regulations restricting speech serve two substantial governmental interests. The first is protecting the rights of privacy and publicity of the citizens of New York. As we recognized in *Lerman v. Flynt Distributing Co.,* 745 F.2d 123, 128–29 (2d Cir.1984), the unconsented use of a person's name for commercial purposes can inflict a kind of harm that mere disclaimer cannot heal. In *Lerman* we quoted language from an article co-authored by Justice Brandeis, which observed that "modern enterprise and invention have, through invasions upon [man's] privacy, subjected him to mental pain and distress, far greater than could be inflicted by mere bodily injury." *Id.* at 129 (quoting S. Warren and L. Brandeis, *The Right of Privacy,* 4 Harv. L.Rev. 193, 196 (1890)). Hence, a regulation restricting commercial advertising on government-owned property is a reasonable means of protecting the ever-shrinking realm of individual privacy.

The second interest is to conduct its commercial activities in a manner that avoids violating state law and any consequent litigation. The majority thinks the violation of the State Civil Rights Law presents no problem because an indemnity agreement protects the

MTA. But indemnity agreements are not self-executing, and a party's attempt to enforce their provisions often leads to extensive legal battles. In short, an indemnity agreement does not eliminate litigation.

As a consequence, having determined that the subject advertisement violates § 50 and that the MTA regulation survives the test of reasonableness, I conclude that plaintiff's First Amendment challenge must fail.

## IV

Finally, the majority uses as some part of the rationale for its decision the notion that the MTA regulations constitute a prior restraint. It seems to me difficult to mount a prior restraint argument in the circumstances of this appeal when the "prior" element is absent. It must be remembered that the advertisement at issue had already appeared on the sides of City buses both before the MTA attempted to remove it and at the time we heard the appeal. *Cf. Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975) (holding that municipal board's denial of use of a city-leased theater for the production of a musi-cal, before anyone had seen it, constituted an illegal prior restraint).

## CONCLUSION

My concern with the majority's conclusion in this case, simply stated, is that by affording the commercial speech at issue as much judicial protection as it has, it fails to distinguish between commercial and non-commercial speech. In so doing, the First Amendment guarantees that safeguard non-commercial speech are diluted, and all speech is thereby leveled at the lowest common denominator. *See Ohralik v. Ohio State Bar Ass'n,* 436 U.S. 447, 456, 98 S.Ct. 1912, 1918–19, 56 L.Ed.2d 444 (1978).

Accordingly, I vote to reverse the district court's issuance of an injunction and would remand the case to that court with a direction that the motion for such relief be denied.