**MILLION YOUTH MARCH, INC., Plaintiff,**

v.

**Howard SAFIR, Commissioner of the New York City Police Department; The City of New York; and Rudolph Giuliani, Defendants.**

**No. 99 Civ. 9261(JSR).**

United States District Court, S.D. New York.

Sept. 1, 1999.

See also 155 F.3d 124.

Thomas & Wareham, LLP, by Roger S. Wareham, Jomo Sanga Thomas, Brooklyn, New York, Malik Z. Shabazz, Washington, D.C., for plaintiff.

Michael D. Hess, Corporation Counsel of the City of New York, Robin Binder, Rachel Goldman, of counsel, New York City, for defendants.

New York Civil Liberties Union Foundation, by Christopher Dunn, Arthur Eisenberg, Norman Siegel, New York City, for amicus curiae New York Civil Liberties Union.

## AMENDED OPINION

CHIN, District Judge.

In this case, plaintiff Million Youth March, Inc. ("MYM") seeks a preliminary injunction ordering defendants City of New York, Police Commissioner Howard Safir, and Mayor Rudolph Giuliani (collectively, the "City") to grant it a permit for a march and rally in Harlem on September 4, 1999. The City opposes the motion principally on the ground that MYM is not entitled to a permit because its organizers, including Khallid Abdul Muhammad, have made numerous offensive statements, including many intended to incite violence.

The City's desire to deny Muhammad and MYM a platform from which to speak is understandable. Many of their statements are bigoted, hateful, violent, and frightening. The right to free speech, however, applies not only to politically correct statements but also to statements that we may disagree with and that, indeed, we may abhor. At least as frightening as the rhetoric of Mr. Muhammad is the possibility of a society where freedom of speech is not respected, and where the right to speak publicly can be denied on the basis of administrative whim, personal dislike, or disapproval of anticipated content.

MYM's motion for a preliminary injunction is granted to the extent ordered by the Second Circuit last year in *Million Youth March, Inc. v. Safir*, 155 F.3d 124, 126 (2d Cir.1998).

## THE FACTS

The factual record before the Court is extremely limited, in part because of the time constraints. The complaint was not filed until Friday, August 27, 1999, and I conducted a hearing yesterday morning. The City submitted two affidavits, documentary evidence, and four videotapes. MYM submitted no affidavits and relied solely on its complaint, certain documents, and representations of counsel.

The following facts are drawn from the complaint, the City's affidavits, the documentary evidence, certain representations of counsel (made on personal knowledge), and the videotapes. Many of the facts are disputed, including the facts as to precisely what happened at the 1998 rally, and why. Because of the time constraints, many of these factual disputes cannot be resolved at this time.

### A. Plaintiff

MYM is a private, not-for-profit organization incorporated in Washington, D.C. According to the complaint, MYM seeks to promote "educational, cultural, moral, spiritual, political and economic development of underprivileged, at-risk youth and students." (Cmplt.¶ 8). One of its leaders is Khallid Abdul Muhammad ("Muhammad").

### B. The 1998 Rally

#### 1. The Application Process

Last year, MYM applied for a permit to conduct a rally on September 5, 1998, on 29 blocks of Malcolm X Boulevard, for approximately 12 hours. The City denied the application, and litigation ensued.

Judge Kaplan found that MYM had demonstrated both irreparable harm and a "clear or substantial likelihood of success on the merits" of its claim that its rights under the First Amendment had been violated. *See Million Youth March, Inc. v. Safir*, 18 F.Supp.2d 334, 339–49 (S.D.N.Y. 1998) ("*MYM I*").[1] Consequently, Judge

---

1. Judge Kaplan's memorandum opinion was initially filed on August 27, 1998. On Sep-

tember 4, 1998, following the Second Circuit's ruling, Judge Kaplan re-issued his

Kaplan issued a preliminary injunction prohibiting the City from relying on the absence of a permit to interfere with MYM's proposed event. *Id.* at 349. Judge Kaplan made it clear that the injunction did not "limit any other lawful exercise of [the City's] authority," including, for example, its authority to maintain access for emergency vehicles and other traffic. *Id.*

The City filed an emergency motion for a stay of the injunction with the Second Circuit. The Second Circuit denied the motion for a stay, but modified the injunction. It determined that it had "no basis" to question the District Court's conclusions with respect to the merits of the First Amendment claim. *Million Youth March, Inc. v. Safir,* 155 F.3d 124, 125 (2d Cir. 1998) ("*MYM II*"). The Second Circuit held, however, that the injunction had to be modified to take into account "all the relevant circumstances," including "considerations of public health, safety, convenience, and cost." *Id.* at 126. The Court ordered the City to permit, instead of the 29–block, 12–hour event that MYM wanted, a 6–block, 4–hour event, with the possibility of diverting "any excess crowds" to "nearby sites." *Id.* at 127.[2]

### 2. *The Rally*

The rally was held on September 5, 1998. A factual dispute exists as to whether the rally started at noon as scheduled or whether it was delayed until 12:20 p.m. MYM contends that the Police Department did not close Malcolm X Boulevard until just 15 minutes before the rally was to start, and because the rally organizers did not have sufficient time to set-up, the rally was delayed.

During the rally, numerous speakers addressed the crowd. Some of them made statements that the City argues were hateful and intended to incite violence. For example, one speaker (not Muhammad) can be seen on the videotapes saying:

But you think Doctor Khallid is wrong? You think Doctor Khallid is mean? You better do every single thing this man demands your wicked white ass to do, because you're gonna have to deal with me, and I ain't asking no questions, I ain't taking no prisoners. I'm taking heads off. I'm shooting in the back. I'm shooting in the face. I'm aiming for the heart, and, I ain't begging, I ain't pleading, and I ain't asking a soul to like it, come with me, join me, or take part in nothing. I'm digging this country by myself. You talking about a real [unintelligible] and when we come for you, we'll come when you least expect it, where you least expect it. And for all of our people out here I'm gonna let my brother have a word. Stay away from these talk shows, Ricki Lake and Jerry Springer. You ... now let me tell you about Jerry Springer, the big crooked-nose, bagel-eating, wicked, damn penny-pinching, wicked, slimy, ruthless, damn low-slime-of-the-earth-ass Jew. Now quote me, now quote me, death to the United States government, police force. Death to every oppressor, black, white, Chinese, or whoever. And whoever won't stand up to take care of our people into this new millennium, the right way we need to be taken care of—death to them. Heads off to everybody who is scared to fight, don't want to fight, don't like to fight. And may God Almighty bless all of our people here and keep

---

memorandum opinion, annexing to it the text of the preliminary injunction order. 18 F.Supp.2d at 349.

**2.** The Second Circuit concluded that Judge Kaplan had issued "an injunction that required the City to allow plaintiff's event in precisely the dimensions that the plaintiff requested." 155 F.3d at 126–27. In fact, Judge Kaplan did not issue such an injunc-

tion. Instead, he merely granted an injunction prohibiting the City from relying on an unconstitutional permitting scheme as a basis for interfering with plaintiff's proposed event. 18 F.Supp.2d at 349. Under Judge Kaplan's injunction, the City was free to lawfully exercise its authority to address health, safety, and other concerns. *Id.*

this, uh, a peaceful event so that we will be, so that we will leave peacefully and won't be attacked by these vicious New York dogs. I'll let my brother have a word with you here, and I leave you in peace. Al Salaam Alakam.

Other speakers, however, addressed such topics as black pride, education, crime, and commitment to family and community.

Muhammad addressed the crowd approximately ten minutes before 4 p.m. I have viewed the videotape of Muhammad's speech, and the text of the entire speech is set forth as an addendum to this opinion. Although he does urge the crowd to "take their goddamn guns" from the police and "use their guns on them," he tells them to do so pointedly in the context of self-defense:

> And if you don't have a gun, everyone of them has one gun, two guns, maybe three guns. In self defense, if they attack you, take their goddamn guns from them and use their guns on them. In self defense. Giuliani is known for taking his police and sending them off in riots.

Muhammad concluded his speech as follows:

> This is not going to be no Million Youth Farce, oh no. In fact, we'd love to tangle with you today. Isn't it a good feeling to outnumber the police sometimes? Isn't it a good feeling to know that in unity, we can do whatever we will.

> I want you now, brothers and sisters, in a very orderly way, with love for each other, don't push each other, don't trample each other, if one of the brothers or sisters steps on your foot, you apologize to them for stepping on your foot. Go in the word love. Go in the word peace, with your own brothers and sisters. We greet you next year, Million Youth March on Eastern Parkway in Brooklyn, New York, in Crown Heights next year. In black power.

> Black power. Black power. Black power. Black power. Black Power. Black power.

> Go home to your families, brothers and sisters.

One of the videotapes shows that as 4 p.m. approached, the rally was apparently coming to an end. As the material quoted above suggests, Muhammad was finishing his remarks. The videotape also shows dozens of police officers starting to move toward the stage, and it appears from the videotapes that the police were taking steps to end the rally. One of the videotapes shows a helicopter flying by at what would appear to be an unusually low altitude, just as Muhammad's speech was coming to an end with his repeated chant of "Black power."

The videotapes also show a confrontation suddenly breaking out between certain of the participants and police officers. Barricades and other objects are thrown and people are shoved and pushed. One man—perhaps a photographer, who was standing on top of what appeared to be a power generator—is seen being violently pulled off the generator onto the ground by another individual, who is difficult to identify. Numerous participants and some 20 police officers were injured.

The parties sharply disagree as to what provoked the confrontation. MYM contends that because the start of the rally was delayed, the organizers were entitled to some additional time. Moreover, MYM argues, other rallies and parades are given some leeway, and the police do not terminate other events precisely when they are scheduled to end. MYM argues that the Police Department's actions in strictly enforcing the 4 p.m. deadline, and the atmosphere created by what it termed "cattle chutes," subway closings, inordinately large number of police officers dressed in riot gear, and helicopters buzzing the crowd, caused the confrontation.

The City contends that the rally did commence at noon and that participants at

the rally made it clear that they were going to disregard the 4 p.m. deadline. The City argues that the rally participants intentionally sought to provoke the police and that the police had no choice but to take action at 4 p.m.

Five individuals were indicted for misdemeanors, but they were acquitted. A grand jury was convened to consider the filing of criminal charges against Muhammad, but he was not indicted.

## C. *The 1999 Application*

On June 23, 1999, Khallid Abdul Muhammad applied, on behalf of the "Million Youth March/New Black Panther Party," to the Street Activity Permit Office of the Mayor's office for a permit to conduct a "political/educational/religious event" on September 4, 1999 between 10 a.m. and 7 p.m. (Connolly Aff., Ex. A).[3] The application represented that the event was to take place on Malcolm X Boulevard between 134th and 115th Streets in Manhattan. It estimated that 50,000 people would attend. It asked for the street to be closed for 12 hours, from 8 a.m. to 8 p.m. (*Id.*).

On July 14, 1999, Daniel S. Connolly, Esq., Special Counsel to the New York City Law Department, wrote on behalf of the City to Muhammad. Connolly advised Muhammad that the City was "prepared to permit [the Malcolm X Boulevard] event to the extent authorized" by the Second Circuit in its decision last year. (Connolly Aff., Ex B). The letter noted that the Police Department would have to approve certain details, such as the specific site on Malcolm X Boulevard where the event would take place and the starting time, and the letter further noted that the Police Department would request a "written commitment" that the event would end as scheduled. The letter also noted that the City was "prepared to consider an application for Randall's Island." Connolly concluded his letter by asking for a "prompt

response," no later than July 26, 1999. (*Id.*).

Connolly did not hear from Muhammad by July 26, 1999. Accordingly, on July 29, 1999, he wrote a letter to Malik Z. Shabazz, Esq., who was listed in the permit applications as "Producer/Event Manager." (Connolly Aff. ¶ 8 & Ex. C). Connolly received no response, and thus he tried to contact Shabazz by telephone. He finally spoke with Shabazz on August 10, 1999. After Connolly stressed the need for a prompt response to his July 14, 1999 letter, Shabazz stated he would get back to Connolly in 48 hours. (Connolly Aff. ¶ 9).

Shabazz did not get back to Connolly as promised, and on August 16, 1999 Connolly sent Shabazz another letter, by fax and certified mail, again requesting a response to the July 14th letter. (Connolly Aff. ¶¶ 9–10 & Ex. D).

About an hour later, Shabazz faxed a letter, dated August 13, 1999, to Connolly. (Connolly Aff. ¶ 11 & Ex. E). Shabazz stated in his letter that:

[W]e will require the following:

1. A permit to actually march from the end of Malcolm X Boulevard at 145th Street down to the March Stage Site at 119th Street, beginning at 9 a.m.

2. A time of 11:00 a.m. until 6:00 p.m. . . . .

3. A space from 117th Street to 126th Street, with allowances for traffic on 125th Street.

4. Guarantees on reductions in the number of police/riot troops at the rally, the opening of subways, and full access to the March via surrounding side streets.

(Connolly Aff., Ex. E).

Connolly responded to Shabazz by letter dated August 18, 1999. (Connolly Aff., Ex. F). It stated that "[t]he request for permits as described in your August 13th letter will not be approved." Connolly

---

**3.** Muhammad also filed an application for a rally at One Police Plaza the same day, but

the application was later withdrawn. (Connolly Aff. ¶ 2 & Ex. E).

further stated in his letter that Shabazz had not responded to the issues raised in the July 14th letter and that "[f]urther delay" in responding would interfere with the City's ability to approve events that required the closing of any roadways on September 4th. (Connolly Aff., Ex. F).

Connolly faxed a copy of the letter to Jomo Thomas, Esq., another of MYM's attorneys. He spoke with Thomas on August 23, 1999 and explained in that conversation that the City was willing to authorize an event of the scope and duration authorized by the Second Circuit last year and again requested the information sought in his July 14th letter. Thomas spoke about a revised proposal and Connolly asked him to put it in writing. (Connolly Aff. ¶¶ 14–15; Cmplt. ¶ 16).

On the evening of August 23, 1999, Thomas faxed a letter to Connolly following up on their discussion. (Connolly Aff., Ex. G). Connolly did not see the letter until the next day. The letter acknowledged the Second Circuit's decision, but stated that "the circumstances are somewhat different tha[n] those we faced last year." The letter observed that the "conveners" of the event were proposing a "short march (from 135th Street to 118th Street, i.e. less than a mile), as well as a rally." The letter noted that the organizers anticipated the march would last from 11 a.m. to 2 p.m. and the rally from 2 p.m. to "approximately 6 p.m." The letter noted that the conveners would operate on a "good faith basis" to stay within the time limits, but that they expected the "same flexibility" with respect to ending the event accorded other types of parades and marches. If the City were insisting on "strict adherence to the minute to a set time," the letter noted, then the conveners would request a longer period—from 2 to 7 p.m. (Connolly Aff., Ex. G).

While the lawyers were communicating with each other on August 23rd, as one of the City's videotapes shows, Muhammad stated at a press conference that "[w]e will march with or without a permit, little cracker." [4] The videotape also shows Muhammad, at another press conference, stating:

We want to make it clear here today that no devil, racist, cantankerous, constipated cracker like the mayor here, Giuliani, can stop black youth from self-determination and self-defense.

Thomas telephoned Connolly several times on August 25, 1999, but Connolly was not available. Roger Wareham, Esq., another of MYM's attorneys, then telephoned Michael D. Hess, Esq., the Corporation Counsel of the City, on August 25th. Wareham and Hess agreed to speak further and to make an effort to resolve the matter without litigation.

On August 26, 1999, while he believed that the discussions regarding a permit were still pending, Wareham learned—from a reporter—that the Mayor had announced at a press conference that the City was not going to issue a permit because the "deadline" had passed. This was the first notice that Wareham and MYM had received that the application was being denied.

### D. *The Complaint*

This action was filed the next morning, on Friday, August 27, 1999. The complaint alleges that defendants have violated MYM's rights to free speech and assembly under the First Amendment to the United States Constitution.

MYM immediately applied for an order to show cause why a preliminary injunction should not be issued requiring the City to permit MYM on September 4, 1999 to conduct a march down Malcolm X Boulevard from 145th Street to 118th Street and a rally on Malcolm X Boulevard between 118th Street and 127th Street.

I heard the matter as the Part I judge. I spoke with counsel briefly at a conference on Friday, August 27th, and set the

---

4. The reference to "little cracker" was to the reporter who asked the question.

matter down for a hearing on Monday, August 30, 1999.

At the August 27th conference, I directed the City to formally advise MYM in writing of the reasons it denied the application for a permit. That afternoon, Hess sent a letter to MYM's attorneys formally denying the application. This was the first formal notice given by the City to MYM advising that its application was denied.

The City also filed an affidavit setting forth the bases for the denial. The affidavit gives essentially three reasons: (1) MYM's proposed event exceeded the parameters permitted by the Second Circuit in its decision last year; (2) Muhammad had reportedly announced that the march and rally would take place even if a permit were not granted; and (3) Muhammad had repeatedly made statements advocating violence and 20 officers were injured at last year's rally because demonstrators had been incited to violence by the rally organizers. (Hess Decl. ¶¶ 2–4 & Ex. 1).

### DISCUSSION

■ Because MYM is seeking to enjoin governmental action taken in the public interest pursuant to a regulatory scheme, and because a preliminary injunction would provide MYM with substantially all the relief it could obtain following a trial on the merits, MYM must show, in addition to irreparable harm in the absence of the requested relief, "a clear or substantial likelihood of success on the merits" of its claim of a First Amendment violation. *MYM I*, 18 F.Supp.2d at 338–39; *accord Bery v. City of New York*, 97 F.3d 689, 693 (2d Cir.1996), *cert. denied*, 520 U.S. 1251, 117 S.Ct. 2408, 138 L.Ed.2d 174 (1997).

### A. *Irreparable Harm*

■ MYM's allegation of the imminent loss of its First Amendment rights is sufficient to establish the likelihood of irreparable harm in the event a preliminary injunction is not issued. *MYM I*, 18 F.Supp.2d at 339–40 (quoting *Elrod v. Burns*, 427 U.S. 347, 373–74, 96 S.Ct. 2673, 49 L.Ed.2d

547 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.")). Here, defendants concede that the irreparable injury requirement is met if MYM is able to demonstrate a likelihood of success on the merits of its claim of a First Amendment violation. (Def.Mem. at 8 n. 1).

### B. *Likelihood of Success on the Merits*

MYM relies on two legal theories: first, that the City's regulatory scheme for the granting of permits is unconstitutional on its face, and second, that the City has engaged in unconstitutional content-based discrimination.

#### 1. *The Facial Challenge: Constitutionality of Licensing and Permitting Schemes*

■ A party may not conduct a rally or parade within the City without a permit. Because an applicant for a permit for a rally or parade may not engage in expressive activity without a permit, the City's requirement of a permit constitutes a prior restraint on speech. *See Beal v. Stern*, 184 F.3d 117, 124 (2d Cir.1999). "The essence of prior restraints are that 'they g[i]ve public officials the power to deny use of a forum in advance of actual expression.'" *Id.* (quoting *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 553, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975)). Prior restraints on speech, however, "are the most serious and the least tolerable infringement on First Amendment rights." *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 559, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976).

■ The conclusion that a regulation constitutes a prior restraint on speech "is not dispositive of its constitutional validity." *Beal*, 184 F.3d at 124. "Although there is a 'heavy presumption' against the validity of a prior restraint, the [Supreme] Court has recognized that government, in order to regulate competing uses of public

forums, may impose a permit requirement on those wishing to hold a march, parade, or rally." *Forsyth County v. Nationalist Movement,* 505 U.S. 123, 130, 112 S.Ct. 2395, 120 L.Ed.2d 101 (1992) (citations omitted). Hence, licensing or permitting schemes that contain content-neutral time, place, and manner restrictions on speech will be permitted so long as they are "narrowly tailored to serve a significant governmental interest, ... leave open ample alternatives for communication," and do "not delegate overly broad licensing discretion" to government officials. *Id.*

■ Limitations on excessive official discretion are necessary because a regulation susceptible to arbitrary application "has the potential for becoming a means of suppressing a particular point of view. To curtail that risk, a law subjecting the exercise of First Amendment freedoms to the prior restraint of a license must contain narrow, objective, and definite standards to guide the licensing authority." *Forsyth,* 505 U.S. at 130–31, 112 S.Ct. 2395 (internal quotations and citations omitted). Accordingly, as the Supreme Court has repeatedly held, "a law subjecting the exercise of First Amendment freedoms to the prior restraint of a license, without narrow, objective, and definite standards to guide the licensing authority, is unconstitutional." *Nichols v. Village of Pelham Manor,* 974 F.Supp. 243, 250 (S.D.N.Y.1997) (quoting *Shuttlesworth v. City of Birmingham,* 394 U.S. 147, 150–51, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969)).

Last year, Judge Kaplan held that the City's licensing scheme was unconstitutional because it lacked definite standards, as a consequence of which denial of a permit pursuant to the scheme was unlawful. *See MYM I,* 18 F.Supp.2d at 342–44. Judge Kaplan found that MYM's 1998 application had been "considered on an *ad hoc* basis" and that "the City gave no clear indication of what, if any, statute or rule governed its determination." *Id.* at 342. It was only in the final stages of the preliminary injunction hearing that the City relied on Section 10–110 of the New York City Administrative Code, an argument that was "inconsistent with [the City's] earlier correspondence." *Id.* at 342–43. Judge Kaplan found that the City denied the application based either on the "Activity Rules" of the Street Activity Permit Office of the Community Affairs Unit of the Office of the Mayor or a combination of the Activity Rules and Section 10–110. *Id.* at 343. Judge Kaplan concluded that the City's statutory scheme "vest[ed] unconstitutional discretion" in City officials to determine when to issue a permit. *Id.* at 344.

■ This year, little has changed in this respect. While it is true that part of last year's permitting scheme has been revised in that responsibility for permitting has been transferred from the Mayor's Office to the Police Department, it is still the case that there are no "narrow, objective, and definite standards to guide the licensing authority." *Forsyth,* 505 U.S. at 131, 112 S.Ct. 2395. Moreover, the City gave no indication of what statute or rule it was relying on until oral argument yesterday. Indeed, it did not formally deny MYM's applications, and did not explain its reasoning for the denial, until after suit was filed. MYM's attorney still believed that the City was willing to grant a permit—on terms still being negotiated—when he learned from a reporter that the Mayor announced that the applications had been denied. Moreover, when the formal denial was finally issued, the reasons given by the City for denial were inconsistent, at least in part, with the position taken in the City's earlier correspondence.

In its memorandum of law, the City did not even purport to identify the "standards" upon which it relied to deny the application. Yesterday, when pressed at the hearing to identify the standards relied on by the City to deny the applications, the City's counsel cited Police Department regulations, without specifying which regulations. Presumably, he was referring to Section 10–110 of the New York City Administrative Code, governing "Processions

and Parades," and Section 321–14 of the Police Department Administrative Guide. Those regulations, however, merely set forth deadlines for submitting permit applications, and it is undisputed that MYM met those deadlines here.

As in 1998, the City has been unable to point to any clear standards upon which it relied in denying MYM a permit. MYM therefore has made a clear and substantial showing of a likelihood of success on the merits on its claim that the City's permitting scheme grants unconstitutional discretion to its officials.

### 2. The As–Applied Challenge: Content–Based Regulation of Speech

■ Even assuming the applicable permitting regulation did not give government officials unfettered discretion and in fact set forth neutral standards for determining which permit applications should be granted and which should not, the City could not deny a permit on the basis of the content of protected speech. The First Amendment generally prevents the government from proscribing speech because of disapproval of the ideas expressed, *R.A.V. v. City of St. Paul,* 505 U.S. 377, 382, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992), and, indeed, "[c]ontent-based regulations are presumptively invalid." *Id.* (quoting *Simon & Schuster, Inc. v. Members of the N.Y. State Crime Victims Bd.,* 502 U.S. 105, 115, 112 S.Ct. 501, 116 L.Ed.2d 476 (1991)).

Freedom of speech, however, has never been interpreted "to give absolute protection to every individual to speak whenever or wherever he [or she] pleases or to use any form of address in any circumstances that he [or she] chooses." *Cohen v. California,* 403 U.S. 15, 19, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971); *see also Chaplinsky v. New Hampshire,* 315 U.S. 568, 571, 62 S.Ct. 766, 86 L.Ed. 1031 (1942). Indeed, "[f]rom 1791 to the present, ... our society, like other free but civilized societies, has permitted restrictions upon the content of speech in a few limited areas, which

are 'of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality.'" *R.A.V.,* 505 U.S. at 382–83, 112 S.Ct. 2538 (quoting *Chaplinsky,* 315 U.S. at 572, 62 S.Ct. 766).

■ One such permissible restriction on speech is the proscription on so-called "fighting words." *See Chaplinsky,* 315 U.S. at 572, 62 S.Ct. 766. The Supreme Court has defined "fighting words" as "those which by their very utterance inflict injury or tend to incite an immediate breach of the peace." *Id.* The Supreme Court has consistently held that government may proscribe speech that is directed towards inciting or producing lawless action, and is likely to incite or result in such action. *See, e.g., Brandenburg v. Ohio,* 395 U.S. 444, 447, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969); *see also United States v. Rahman,* 189 F.3d 88, 115 (2d Cir.1999). As the Second Circuit recently stated in *Rahman,* "[i]t remains fundamental that while the state may not criminalize the expression of views—even including the view that violent overthrow of the government is desirable—it may nonetheless outlaw encouragement, inducement, or conspiracy to take violent action." 189 F.3d 88 at 115.

■ In *Yates v. United States,* however, the Supreme Court held that only the advocacy of *concrete* violent action may be proscribed, but not "advocacy and teaching of forcible overthrow as an abstract principle, divorced from any effort to instigate action to that end." 354 U.S. 298, 318, 77 S.Ct. 1064, 1 L.Ed.2d 1356 (1957), *overruled in part on other grounds by Burks v. United States,* 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978). In *Brandenburg* as well, the Court made clear that government may proscribe advocacy of lawlessness only where such advocacy is directed towards, and is likely to result in, *"imminent* lawless action." 395 U.S. at 447, 89 S.Ct. 1827 (emphasis added).

The City has conceded that its denial of a permit amounts to a content-based regulation of speech. It contends that the denial of a permit based on the content of the proposed speech of MYM's organizers is appropriate, however, because the words they have uttered in the past amount to "fighting words" and therefore are not protected by the First Amendment. Although many of the statements made by Muhammad are hateful and offensive, I conclude that the City's arguments in this respect must be rejected.

First, the City's reliance on the statements made at last year's rally is inconsistent with the position it took in its correspondence. Connolly stated in his July 14, 1999 letter that the City was "prepared to permit [the Malcolm X Boulevard] event to the extent authorized" by the Second Circuit in its decision last year. As late as August 23, 1999, Connolly reiterated that the City was willing to authorize an event of the scope and duration authorized by the Second Circuit last year. Wareham and Hess were still discussing the application on August 25th when the Mayor announced at a press conference on August 26th that the permit was denied. Although Connolly raised concerns emanating from last year's rally, he did so only in the context of setting the parameters for this year's rally. It was only *after* suit was filed that the City purported to rely on the speeches made at last year's rally to deny, outright, this year's application.

█ Second, the speeches made by Muhammad and his fellow demonstrators at last year's rally and the statements made by Muhammad in the last several weeks do not amount to "fighting words" under *Chaplinsky* and its progeny. Many of the statements certainly are hateful, racist, and offensive, and many of the statements openly call for violence. Even hateful, racist, and offensive speech, however, is entitled to First Amendment protection. It loses that protection under the "fighting words" doctrine only if it can be said to have incited "*imminent* lawless action," *Brandenburg*, 395 U.S. at 447, 89 S.Ct. 1827 (emphasis added), or "an *immediate* breach of the peace." *Chaplinsky*, 315 U.S. at 572, 62 S.Ct. 766 (emphasis added).

I am not persuaded that, in context, the challenged statements are words that "by their very utterance inflict injury or tend to incite an *immediate* breach of the peace." *Id.* (emphasis added). Indeed, the messages of hate and violence conveyed by several of the speakers at last year's rally did not permeate the rally to the exclusion of all other messages and ideas. Muhammad was careful to inject the concept of self-defense into his most offensive comments. Moreover, the rally continued for almost four hours without incident and clearly was coming to an end. It was not until the rally ended at 4 p.m. that the confrontation ensued between certain participants and police officers. It is impossible to determine, on this limited record, who initiated the confrontation and who provoked the scuffling and violence, and therefore I cannot conclude that the violence occurred as a direct result of the inflammatory words uttered by Muhammad (and others) to the crowd. To the contrary, one of the videotapes shows that, at the time the conflict broke out, Muhammad was telling the demonstrators to "[g]o home to [their] families," to "[g]o in the word love," to "[g]o in the word peace," and that the crowd had already begun to disperse. Indeed, the words that the City contends are undeserving of First Amendment protection had actually been uttered at some time before the disturbance broke out.

I have carefully reviewed the videotapes. On the limited record before me, I am unable to, and do not, make findings as to the cause of the confrontation at the end of the rally. But I am left with the disquieting impression that the rally was ending and that if the police had simply been patient and given the participants a few minutes to disperse, the risk of violence would have been substantially reduced.

The scenes of demonstrators throwing barricades and other objects are disturbing, but also disturbing is the spectacle of dozens of police officers in riot gear moving in on the stage, with a helicopter swooping overhead, just moments after the rally was scheduled to end, when the rally was indeed about to conclude.

The City argues that the Million Youth March is not the Thanksgiving Day Parade. Of course it is not. There is no question that, given the statements that had been made by the organizers of the rally, the police had the responsibility to take adequate security measures, measures that would not be called for at the Thanksgiving Day Parade. But any security measures used to regulate speech must be reasonable and "narrowly tailored."

■ Third, even assuming the speech uttered at last year's rally did amount to "fighting words," the words were said a year ago. The "fighting words" doctrine usually arises in the context of punishment for past conduct, such as in a criminal prosecution of an individual for inciting violence. *See, e.g., Hess v. Indiana,* 414 U.S. 105, 109, 94 S.Ct. 326, 38 L.Ed.2d 303 (1973) (reversing conviction of person who during street disorder used the word "fuck" to a sheriff and stated "[w]e'll take the fucking street later" or "[w]e'll take the fucking street again" on grounds that the statements could not be construed as being likely to produce imminent unlawful behavior).[5] The fighting words doctrine has not been used as a basis for justifying a "prior restraint" on future speech, and to

deny plaintiff a permit this year based on comments made by the speakers at last year's rally would constitute an unlawful prior restraint on speech. *See Carroll v. President & Comm'rs of Princess Anne,* 393 U.S. 175, 180–81, 89 S.Ct. 347, 21 L.Ed.2d 325 (1968) ("Ordinarily, the State's constitutionally permissible interests are adequately served by criminal penalties imposed after freedom to speak has been so grossly abused that its immunity is breached. The impact and consequences of subsequent punishment for such abuse are materially different from those of prior restraint. Prior restraint upon speech suppresses the precise freedom which the First Amendment sought to protect against abridgment.").[6]

As the Fifth Circuit has held in a parade case:

The state is not powerless to prevent imminent violence or lawlessness resulting from a clash between the marchers and onlookers. If this situation arises, the police must try first to disperse and control the crowd, and if that becomes impossible, the marchers may be arrested. Likewise, if the marchers exceed the bounds of persuasion and argument and enter the realm of incitement to imminent lawless action, they can be punished. Such punishment or curtailment of First Amendment rights must be based on a present abuse of rights, not a pre-nascent fear of future misconduct.

*Beckerman v. City of Tupelo,* 664 F.2d 502, 510 (5th Cir.1981) (citations omitted); *see also Admiral Theatre v. Chicago,* 832

---

5. Significantly, here, according to MYM's counsel, a grand jury investigated Muhammad for the events at last year's rally and determined not to indict him.

6. "Any prior restraint on expression comes to [a court] with a 'heavy presumption' against its constitutional validity," *see Organization for a Better Austin v. Keefe,* 402 U.S. 415, 419, 91 S.Ct. 1575, 29 L.Ed.2d 1 (1971), and, indeed, prior restraints on speech are universally condemned as unconstitutional. *See, e.g., id.* at 418–20, 91 S.Ct. 1575 (holding as

unconstitutional prior restraint injunction granted by Illinois court that prohibited group from passing out handbills anywhere in a town where the group had sought to distribute information about a real estate agent they thought was engaging in racially inflammatory practices); *Carroll v. President & Comm'rs of Princess Anne,* 393 U.S. 175, 180–81, 89 S.Ct. 347, 21 L.Ed.2d 325 (1968) (relying on prior restraint doctrine to invalidate a state court injunction barring controversial rally near the steps of a town courthouse).

F.Supp. 1195, 1204–05 (N.D.Ill.1993) (holding it would be impermissible prior restraint to prohibit future speech by adult theater and nude dancers based on content of either past or anticipated speech); *Kunz v. People of State of New York,* 340 U.S. 290, 71 S.Ct. 312, 95 L.Ed. 280 (1951) (holding that denial of permit without appropriate standards based on past speech that caused disorder was unconstitutional prior restraint).

The Seventh Circuit's decision in *Collin v. Chicago Park District,* 460 F.2d 746 (7th Cir.1972), is also instructive. There, a member of the Nazi Party applied for a permit to hold a rally in a Chicago public park. The permit was denied, in part because the applicant had led a "public assembly" in another Chicago park within the prior year that had led to a "public commotion" that required police action and that "was, or could have led to, a riot or breach of the peace." 460 F.2d at 748. The Seventh Circuit held that the Nazi Party member was entitled to a permit. The court held:

> On the basis of controlling precedent we can only conclude that such past violence, if relevant at all, must be extremely closely related in time and character to the permit for which the plaintiff applies. The law does not permit us to infer because a person has resorted to violence on some past occasions that he will necessarily do so in the future.

460 F.2d at 754.

I do not hold that a person's past conduct or speech can never justify a denial of that person's application for a permit to speak or assemble. The City, however, bears the burden of proving that prior restraint of the Million Youth March is valid. *See Speiser v. Randall,* 357 U.S. 513, 526, 78 S.Ct. 1332, 2 L.Ed.2d 1460 (1958); *New York Magazine, A Div. of*

*Primedia Magazines, Inc. v. Metropolitan Transp. Auth.,* 136 F.3d 123, 131 (2d Cir.), *cert. denied,* —— U.S. ——, 119 S.Ct. 68, 142 L.Ed.2d 53 (1998). As the Supreme Court has held:

> Any system of prior restraint ... "comes to this Court bearing a heavy presumption against its constitutional validity." The presumption against prior restraints is heavier—and the degree of protection broader—than that against limits on expression imposed by criminal penalties. Behind the distinction is a theory deeply etched in our law: a free society prefers to punish the few who abuse rights of speech after they break the law than to throttle them and all others beforehand. It is always difficult to know in advance what an individual will say, and the line between legitimate and illegitimate speech is so finely drawn that the risks of freewheeling censorship are formidable.

*Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975) (quoting *Bantam Books, Inc. v. Sullivan,* 372 U.S. 58, 70, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963)) (citations omitted). "[T]he burden of instituting judicial proceedings, and of proving that the material is unprotected, must rest on the censor." *New York Magazine,* 136 F.3d at 131 (quoting *Southeastern Promotions,* 420 U.S. at 560, 95 S.Ct. 1239).

The City has not met that burden here. Accordingly, I hold that MYM has made a clear and substantial showing of a likelihood of success on the merits of its as-applied challenge to the City's denial of a permit.[7]

### 3. *Scope of Relief*

As the Second Circuit made clear last year, a holding that plaintiff is entitled to an injunction ordering the City to allow

---

7. As to the City's argument that Muhammad's recent statements that MYM would march, with or without a permit, constitute a basis for denying the permit, Judge Kaplan rejected this argument last year, *see MYM I,* 18 F.Supp.2d at 340–41, and the Second Circuit did not disturb that ruling. For the reasons set forth in Judge Kaplan's decision, I reject the argument as well.

plaintiff's event to go forward does not mean that the City must allow the event on plaintiff's specified terms. *See MYM II*, 155 F.3d at 125. Instead, a district court issuing an injunction as an exercise of its equitable authority "must sensitively assess all the equities of the situation, including the public interest." *Id.* Of course, any relief that varies from plaintiff's terms will necessarily contain restrictions on the time, place, and manner of plaintiff's speech and therefore must be narrowly tailored to serve a significant governmental interest and provide a reasonable alternative channel of communication. *See Ward v. Rock Against Racism*, 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989); *MYM II*, 155 F.3d at 127.

The City has a significant interest in regulating "street activity to protect the public safety." *MYM I*, 18 F.Supp.2d at 345. While the relief fashioned must be narrowly tailored to advance this interest, it need not be the least intrusive or least restrictive means of doing so. *See Ward*, 491 U.S. at 798–99, 109 S.Ct. 2746. In this regard, the Second Circuit has instructed that the proper inquiry for the district court to undertake is not what the City is "physically capable of doing," but rather an in-depth consideration of all relevant circumstances, including "public health, safety, convenience, and cost." *MYM II*, 155 F.3d at 126.

The injunction also must provide a reasonable alternative channel of communication to plaintiff. Plaintiff is entitled to "reach the minds of willing listeners," which includes the "opportunity to win their attention." *Heffron v. International Soc'y for Krishna Consciousness*, 452 U.S. 640, 655, 101 S.Ct. 2559, 69 L.Ed.2d 298 (1981) (quoting *Kovacs v. Cooper*, 336 U.S. 77, 87, 69 S.Ct. 448, 93 L.Ed. 513 (1949)). While plaintiff's preferred location for reaching willing listeners is not irrelevant to the analysis, plaintiff does not have a constitutional right to the forum of its choice. *See MYM I*, 18 F.Supp.2d at 347;

*Irish Lesbian & Gay Org. v. Giuliani*, 918 F.Supp. 732, 744 (S.D.N.Y.1996) (citing *Heffron*, 452 U.S. at 647, 101 S.Ct. 2559).

The Second Circuit weighed these factors last year and concluded, on the basis of an estimated attendance of 50,000, that the event should be limited to four hours and six blocks. In fact, substantially fewer than 50,000, and perhaps as few as 6,000, attended. This year, MYM estimates that 20,000 people will attend, but given last year's attendance and the apparent lack of support in the Harlem community for the rally this year, the 20,000 estimate seems optimistic.

Putting aside the issue of "fighting words," neither side has argued that the "relevant circumstances," in terms of "considerations of public health, safety, convenience, and cost," are any greater this year. There is nothing in the record to suggest that this Labor Day weekend will be any more, or any less, busy than Labor Day weekend last year. Although the West Indian Day Parade has already been held, the parties have not presented any evidence as to whether any other comparable events will be held instead. On the limited record before the Court, I can only conclude that there is no material change in these "relevant circumstances."

MYM seeks a longer period of time for the rally and a permit for a parade as well. Weighing all of the above considerations, however, I am not persuaded that the City should be ordered to grant a permit for anything more than the Second Circuit allowed last year. MYM will still have the opportunity to exercise its First Amendment rights with a 4–hour, 6–block event.

The videotapes submitted by the City contain some news reports that suggest that the Harlem community is not in favor of the rally. In view of the offensive nature of some of the rhetoric of the rally's organizers and the recent incident with Councilman Bill Perkins (which is also covered in the City's videotapes), the lack of support is not surprising. I am concerned

about the burdens and inconvenience that the rally will place on the residents and businesses of Harlem, and I considered the alternative, approved by the Second Circuit last year, of Randall's Island. Although I specifically raised the issue at the hearing yesterday, neither side addressed it. Given the absence of any evidence in the record as to the feasibility of Randall's Island as an alternative, and because neither side pressed the point, in the end I concluded that Randall's Island was not an option, at least on the record before me.

## CONCLUSION

MYM's motion for a preliminary injunction is granted to the following extent only: The City is hereby ordered to grant a permit to MYM to conduct a rally on Malcolm X Boulevard on September 4, 1999, limited to a duration of four hours and an area of six blocks. In the event that more people can attend than can be safely accommodated within the area of six blocks, the City is authorized either to divert any excess crowds to nearby sites or, if in the judgment of responsible police officers on the scene it is preferable to extend the area of the event for two or three additional blocks along Malcolm X Boulevard, to permit such an extension. The City is also authorized to maintain reasonable access along and across Malcolm X Boulevard for emergency vehicles.

The parties are to promptly meet to discuss the precise blocks and hours for the event and to agree on measures to avoid the confrontation that occurred last year. I will not limit the number of police officers assigned to the rally or otherwise interfere with the City's efforts to carry out its responsibilities with respect to the rally. I only make two final observations. First, the violence that occurred last year cannot be repeated, and both sides should make every effort to reduce hostilities. Second, excessive numbers of police officers in riot gear, rigid enforcement of deadlines, and helicopters swooping over the crowd can only increase, rather than lessen, tensions.

SO ORDERED.

## ADDENDUM

The following is the entire text of Muhammad's speech at the 1998 rally.

Black Power. Black Power. Black Power. Black Power. Black Power. All praise is due to Allah. Giving honor to God. In the name of Allah, the beneficent, the merciful. All praise is due to Allah, the Lord of all the World. We better thank Almighty God for coming in the person of master Farak Muhammad, raising up in our midst a divine leader, a divine teacher and a divine guide in the person of the most honorable Elijah Muhammad. We thank the two of them for the man who is my teacher, my mentor, the man who is largely responsible for what I am and what I am becoming, and I will never deny him. I speak of none other than my spiritual father, the honorable Minister Louis Farrakhan. In their names I greet you with the greetings words of peace, Al Salaam Alakam.

Black Power. Put your black fists in the air. If you will look around you, you will see that they [the police] have lined up all in the trenches. If you look in the rear to this section, you will see they have lined up down the middle. And if you can see around the side of the stage, you will see them in their riot helmets and everything.

We say to you today, you no good bastards, that destroys even today. You have lined up, Giuliani, you have sent your troops, but these, the sons and daughters of Africa, the black youth in hills of North America, we have a right to [unintelligible] and self-determination, and we have a right, a God-given right, and according to white law, which ain't worth the paper that it's written on, a constitutional right to defend ourselves against any, against anyone who attacks us. To defend ourselves, self-defense.

And so I say to you, that as we prepare to close out this rally, we want you to be steadfast. Look these bastards in the eyes and if anyone attacks you, already decide who will be the one to disconnect the railing where you are and beat the hell out of them with the railing where you are. No good bastards.

And if you don't have a gun, everyone of them has one gun, two guns, maybe three guns. In self defense, if they attack you, take their goddamn guns from them and use their guns on them. In self defense. Giuliani is known for taking his police and sending them off in riots. If anyone of these bastards riots here today, you take their nightstick the way they did Brother Abner Louima, and ram it up their behinds, and jam it down their damn throats.

Giuliani, the black youth have God on their side. You came against us and called us a hate march. This is a love march. Black on black love and black unity. You took us to federal court, and your own judge ruled against you. A victory for the Million Youth March. You appealed it and we won. Victory after victory, and if you attack us today, by the power of our God, we'll mop these God damn streets with you today. No good bastards.

So those of you who are in charge, call your dogs off. Remember, decide now who will move the railing where you are and get to whaling on their asses here today. If you're scared, move out now, goddamn it. We came in peace. We came in unity. We came in love. They changed all of the rules.

And stop asking me about the Jews being the bloodsuckers of the black nation, the no good bastards. They are the bloodsuckers of the black community. How many say they are the bloodsuckers of the black community? Let me see your fists in the air.

You don't fear the white man in your own community. They never would have gone to the goddamn Jews in Crown Heights and told their youth that they couldn't march on Utica Avenue, on Eastern Parkway, but they told you that you couldn't march in your own community today. And they did everything to cut this crowd today. They stopped the trains from running in this area, that would have been most convenient. They're turning away people at all of the major cross streets. Turning them away today.

We would not have been able to do any of this. I want you to put your black fist in the air and give special thanks to the world's leader in rap music, No Limit Records, and Brother Master P. [Unintelligible]. How many of you hear me? Holler if you hear me. Holler if you hear me. Holler if you hear me. Go buy every record of Master P you can find. Go get everything of No Limit Records you can find. We'll work on all of our rappers in the future to work toward liberation lyrics and revolutionary rap. But let's give Brother Master P and No Limit Records a show of hands for financing this event here today.

They're trying to shut it down in the back. Are we gonna' let these bastards shut it down? Now we're gonna ask the police, back your asses up and we will leave in peace. Back your asses up, and we will leave in black love and unity, but get the hell out of the way and let our people go. Don't let nobody be arrested. If they grab anyone to arrest them, and you know that it's a police riot, and it is against even white law, then we fight like hell with those who fight against us. For all I know, boot-licking Charlie Rangel is somewhere out in the crowd peeing in his pants. I know Bill Perkins is out there scared to death. I know David Paterson is out there scared to death because you boot-licking, butt-licking, buck-dancing, bamboozled, half-baked, half-fried, sissified, punkified, pasteurized, homogenized niggers, let us get them out of office and put new,

young black leadership in office. Thank you for listening. Al Salaam Alakam. Come on Sister [unintelligible]. Pump it up for us. Somebody get [unintelligible] while we begin to disperse. This is not going to be no Million Youth Farce, oh no. In fact, we'd love to tangle with you today. Isn't it a good feeling to outnumber the police sometimes? Isn't it a good feeling to know that in unity, we can do whatever we will.

I want you now, brothers and sisters, in a very orderly way, with love for each other, don't push each other, don't trample each other, if one of the brothers or sisters steps on your foot, you apologize to them for stepping on your foot. Go in the word love. Go in the word peace, with your own brothers and sisters. We greet you next year, Million Youth March on Eastern Parkway in Brooklyn, New York, in Crown Heights next year. In black power.

Black power. Black power. Black power. Black power. Black Power. Black power.

Go home to your families, brothers and sisters.